Filed 1/7/22  Truck Insurance Exchange v. Kaiser Cement CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
## SECOND APPELLATE DISTRICT
## DIVISION FOUR

| | |
|---|---|
| TRUCK INSURANCE EXCHANGE, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> KAISER CEMENT et al., <br><br> Defendants, Cross-complainants and Appellants; <br><br> LONDON MARKET INSURERS, <br><br> Defendant and Appellant. <br><br> INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, <br><br> Cross-Defendant and Appellant. <br><br> GRANITE STATE INSURANCE COMPANY, et al., <br><br> Defendants and Respondents. | B278091 <br><br> (Los Angeles County Super. Ct. No. BC249550) |

APPEAL from a judgment of the Superior Court of California, Kenneth R. Freeman, Judge. Affirmed in part and reversed in part.

The Cook Law Firm, Philip E. Cook and Brian J. Wright, for Defendant and Appellant, Kaiser Cement and Gypsum Corporation.

Pia Anderson Moss Hoyt, Scott R. Hoyt, Adam L. Hoyt, Greines, Martin, Stein & Richland, Robert A. Olson and Jonathan H. Eisenman, for Plaintiff, Appellant, and Respondent Truck Insurance Exchange.

Duane Morris, Brian A. Kelly, Paul J. Killion and Kathryn T.K. Schultz, for Defendants, Respondents and Appellants London Market Insurers.

Lynberg & Watkins and Wendy E. Schultz for Cross-Defendant, Respondent and Appellant the Insurance Company of the State of Pennsylvania and Defendant and Respondent Granite State Insurance Company.

Squire Patton Boggs, David Godwin and Tania L. Rice for Cross-Defendant and Respondent Continental Insurance. Company (for itself and its successor to certain policies issued by London Guarantee & Accident Company of New York).

Selman Breitman, Elizabeth M. Brockman and Calvin S. Whang for Defendants and Respondents National Casualty Company and Sentry Insurance a Mutual Company, as assumptive reinsurer of Great Southwest Fire.

Crowell & Moring, Mark D. Plevin and Christine E. Cwiertny for Defendants and Respondents Fireman's Fund Insurance Company and Allianz Underwriters Insurance Company f/k/a Allianz Underwriters.

Kendall Brill & Kelly, Alan Jay Weil; Shipman & Goodwin, James P. Ruggeri, Katherine M. Hance and Edward B. Parks II for Defendant and Respondent First State Insurance Company.

Aiwasian & Associates and Deborah A. Aiwasian for Defendant and Respondent Westchester Fire Insurance Company.

Davis Wright Tremaine, Everett W. Jack, Jr. Lawrence B. Burke for Defendant and Respondent Transport Insurance Company, successor in interest to Transport Indemnity Company.

Traub Lieberman Straus & Shrewsberry, Kevin P. McNamara for Defendant and Respondent Evanston Insurance Company as successor by merger with Associated International Insurance Company and TIG Insurance Company (formerly known as Transamerica Insurance Company and as successor by merger to International Insurance Company).

————————————

## INTRODUCTION

This is the latest of several opinions issued by this court in litigation concerning comprehensive general liability (CGL) insurance coverage for asbestos bodily injury claims (referred to by the parties as ABIC) against Kaiser Cement and Gypsum Corporation (Kaiser). The ABIC were brought mostly by laborers who became ill and/or died from exposure to asbestos-containing products manufactured by Kaiser over more than 30 years.

Truck Insurance Exchange (Truck), Kaiser's primary insurer, commenced this action in 2001, after making more than $50 million in indemnity payments to resolve ABIC against Kaiser. Truck sought declaratory relief that its primary coverage of ABIC had been exhausted and it had no further duty to defend or indemnify Kaiser. Truck also sought contribution from certain of Kaiser's excess insurers. Kaiser cross-claimed against Truck and Kaiser's excess insurers, seeking a declaration of coverage.

3

## A.     Earlier Opinions

In the first opinion, *London Market Insurers v. Superior Court* (2007) 146 Cal.App.4th 648 (*LMI*), a different panel of this court resolved what it described as a matter of first impression in California: the meaning of "occurrence" in CGL policies as it relates to per occurrence limits of liability and deductibles in the context of ABIC. (*Id.* at p. 651.) *LMI* held that for purposes of per occurrence limits and deductibles, an "occurrence" under Truck's CGL policies is each claimant's "injurious exposure to [Kaiser's] asbestos products," not (as Truck had contended) Kaiser's manufacture and distribution of those products. (*Id.* at pp. 652, 672.)

On June 3, 2011, this court issued a second opinion: *Kaiser Cement & Gypsum Corp. v. Insurance Co. of the State of Pennsylvania* (2011) 196 Cal.App.4th 140. After granting review, the Supreme Court transferred the case back to this court with directions to vacate the decision and reconsider it in light of *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186 (*Continental Insurance*).

Having done so, this court issued a third opinion, *Kaiser Cement and Gypsum Corp. v. Insurance Co. of the State Pennsylvania* (Apr. 8, 2013) B222310, opn. ordered nonpub. Jul. 17, 2013 (*ICSOP*)).[1] As discussed further below, that opinion decided issues relating to obligations of the Insurance Company of the State of Pennsylvania (ICSOP) under an excess insurance policy it had issued to Kaiser. (*Id.* at pp. 16–36.)

---

1      While *ICSOP* is unpublished, it is citable as law of the case under California Rules of Court, rule 8.1115(b)(1).

## B. The Present Dispute

This opinion resolves an appeal and a cross-appeal from a judgment entered following a three-phase bench trial involving Kaiser, Truck, and certain of Kaiser's excess insurers: ICSOP, London Market Insurers,[2] Granite State Insurance Company, Continental Insurance Company, National Casualty Company, Sentry Insurance, Fireman's Fund Insurance Company, Allianz Underwriters Insurance Company, First State Insurance Company, Westchester Fire Insurance Company, Transport Insurance Company, Evanston Insurance Company, and TIG Insurance Company. The trial commenced in 2014 on Truck's Fourth Amended Complaint and Kaiser's Third Amended Cross-Complaint. The Honorable Kenneth R. Freeman presided over all three phases.

### 1. Phase I

Phase I addressed whether Truck's claim to recover certain per occurrence deductibles from Kaiser for ABIC was barred by the applicable statute of limitations. Truck provided primary insurance coverage to Kaiser over 19 annual policy periods. Kaiser was and continues to be subject to ABIC arising from exposure to its asbestos-containing products during some or all those 19 years.[3]

---

2     London Market Insurers refers to Certain Underwriters at Lloyd's of London and Certain London Market Insurance Companies.

3     ABIC are "long-tail" claims alleging "a series of indivisible injuries attributable to continuing events . . . . [that] produce progressive damage that takes place slowly over years or even

While most CGL policies have per occurrence deductibles, per-occurrence limits, and aggregate limits of liability, during a nine-year period from 1971 to 1980, Truck's primary policies had no aggregate limits.

A dispute arose between the parties about Kaiser's obligation to pay deductibles because, before *LMI,* the meaning of "occurrence" under the primary policies as it related to per occurrence deductibles for ABIC was uncertain. The parties therefore operated under a "billing convention" (Convention) whereby Truck charged a single deductible for each policy year regardless of the number of individual claims instead of charging a per claim deductible. The parties each unilaterally reserved the right to challenge the Convention through various correspondence exchanged over the years.[4]

In January 2007, after this court in *LMI* defined "occurrence" as the separate injurious exposure of each individual claimant, Truck reimbursed Kaiser for defense and indemnity costs. Kaiser incurred those costs because of Truck's previous incorrect interpretation of "occurrence." But Kaiser argues Truck improperly withheld approximately $9.5 million in per occurrence deductible charges from the reimbursement. In August 2007, Truck filed a second amended complaint seeking to recover the disputed per-occurrence deductible payments from Kaiser for the period the Convention was in effect. In defense, Kaiser argued the four-year statute of limitations applicable to contract actions barred any

---

decades. Traditional CGL insurance policies . . . are typically silent as to this type of injury. [Citation.]" (*Continental Insurance, supra,* 55 Cal.4th at pp. 195–196.)

4     For example, in June 1991 correspondence to Truck, Kaiser asserted it "reserve[d] its right to . . . challenge the [C]onvention."

claim for deductibles arising before 2003 (four years prior to Truck's second amended complaint). Kaiser cross-complained to receive what it contended it was entitled to under Truck's insurance policies, including the withheld deductible payments.

The trial court opined "that the issues presented in Phase I present a very close call." Ultimately, it held Truck's claim for additional deductibles did not accrue until this court clarified the definition of occurrence in the 2007 *LMI* decision. It also concluded the parties' Convention "essentially operated as a tolling agreement," allowing Truck to pursue collection of deductibles for claims resolved before 2003. The trial court certified its ruling for review pursuant to Code of Civil Procedure section 166.1, stating it presented "controlling questions of law as to which there are substantial grounds for difference of opinion." The Phase I decision was incorporated into the final judgment. Kaiser appeals.

We agree with the trial court that the Phase I issues present a close call. With the benefit of additional time and substantial additional briefing, however, we have come to different conclusions on the merits. Truck's right to collect a deductible accrued each time it paid a settlement or judgment on each claim, including claim payments made before *LMI*. Moreover, we see no evidence that the parties intended the Convention to "operate[] as a tolling agreement." Because any purported waiver of a statute of limitations defense must be in writing pursuant to Code of Civil Procedure section 360.5, and no such writing exists, Kaiser did not waive the statute of limitations. Thus, we conclude the statute of limitations bars Truck from recovering from Kaiser (or using as a set-off against amounts it owes Kaiser) any unpaid deductible payments for claims where Truck made any indemnity payment

7

more than four years before Truck filed its second amended complaint.

Accordingly, we reverse the portion of the judgment relating to the Phase I decision and remand for further proceedings consistent with this opinion.

## 2. Phase II

Phase II addressed whether Truck could apportion losses against all its policies, not just against Truck's no-aggregate limit 1974 policy that Kaiser selected pursuant to *Armstrong World Industries Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1 (*Armstrong*).

We begin with a brief summary of *Armstrong, supra,* and related cases, in order to frame the issue addressed in Phase II. *Armstrong* holds that once a policy is triggered, the policy typically obligates the insurer to pay "all sums" that the insured shall become liable to pay as damages. (*Armstrong, supra,* 45 Cal.App.4th at p. 105.) With long-tail injuries such as ABIC, this may include damages attributable to other policy periods. (*Ibid.*)

The term "trigger" is used to describe the operative event that must happen during the policy period to activate the insurer's defense and indemnity obligations. (*Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 655, fn. 2 (*Montrose I*); *Continental Insurance, supra,* 55 Cal.4th at p. 196.) A trigger may be (1) "a single event resulting in immediate injury[;]" (2) "a single event resulting in delayed or progressively deteriorating injury[;]" or (3) a continuing event resulting in single or multiple injuries over time. (*Montrose I, supra*, 10 Cal.4th at p. 666.)

The trigger determines which policy or policies may provide coverage. (*Stonelight Tile, Inc. v. California Ins. Guarantee Assn.*

8

(2007) 150 Cal.App.4th 19, 35 (*Stonelight Tile*).) Where damages continue throughout successive policy periods, as with ABIC, all insurance policies in effect during those periods are triggered. (*Montrose I, supra*, 10 Cal.4th at p. 677, fn. 17.) Coverage is not limited to the policy in effect at the time of the precipitating event or condition. (*Ibid*.) Thus, the insurer on a triggered policy may be liable (up to its policy limit) for the entirety of the ensuing damage or injury, not just the injury or damage occurring during that policy period. (*Continental Insurance, supra*, 55 Cal.4th at pp. 199–200; *Aerojet-General Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 56-57 (*Aerojet*); *Armstrong, supra,* 45 Cal.App.4th at p. 105.)

As a result, where a continuous loss is covered by multiple policies, the insured may elect to seek indemnity under a single policy with adequate policy limits. (*Montrose I, supra*, 10 Cal.4th at p. 664.) If that policy covers "all sums" for which the insured is liable, as most CGL policies do, that insurer may be held liable for the entire loss. (*Id.* at p. 665; *Armstrong, supra*, 45 Cal.App.4th at pp. 49–50.) "The insurer called upon to pay the loss may seek contribution from the other insurers on the risk. [Citation.]" (*Stonelight Tile, supra,* 150 Cal.App.4th at p. 37.)

Kaiser selected Truck's 1974 primary policy, which has no aggregate limit of liability, to respond to all ABIC, obligating Truck to pay "all sums" for which Kaiser was liable. The parties have stipulated that the "continuous trigger" and "all sums" approach, as applied in *Aerojet, supra,* 17 Cal.4th 38, and *Armstrong, supra*, 45 Cal.App.4th 1, govern and support Kaiser's selection of the Truck 1974 policy, when triggered, to respond to ABIC.

9

This brings us to the Phase II issue, which relates to Truck's effort to apportion liability to policies other than its 1974 no-aggregate limit policy. In *ICSOP,* this court held that all of Kaiser's primary policies must horizontally exhaust before ICSOP's excess policies attached. (*ICSOP, supra,* at p. 34.) After *ICSOP,* and in spite of Kaiser's *Armstrong* election of the 1974 policy, Truck sought to exhaust other primary policies in other years by apportioning claims triggering the 1974 policy across other primary policies it had issued to Kaiser. Unlike the 1974 policy, those other policies did contain aggregate limits. The trial court rejected Truck's apportionment scheme, finding it would erode Kaiser's coverage for asbestos claims available under Truck's aggregate-limit policies and the excess policies above them.

Truck appeals the trial court's Phase II decision. We affirm.

### 3.    Phase III-A

The Phase III-A trial[5] dealt with two issues. The trial court first addressed whether horizontal or vertical exhaustion applied to Truck's claims against the excess insurers. Because Truck was a primary insurer whose policies had not exhausted, the trial court rejected Truck's argument that the excess insurers had an obligation to "dropdown" and into Truck's shoes as a primary insurer. Truck appeals, based on the recent California Supreme Court decision in *Montrose Chemical Corp. of California v. Superior Court* (2020) 9 Cal.5th 215 (*Montrose III*). *Montrose III* held that vertical exhaustion applied to multiple layers of excess insurance, but did not address exhaustion of primary insurance.

The second Phase III-A issue considered whether Truck's $5,000 per occurrence deductible operated to reduce Truck's per

---

5    There was no Phase III-B trial.

10

occurrence indemnity obligation under the 1974 policy from $500,000 to $495,000, with Kaiser being responsible for a $5,000 per occurrence deductible, or—as the excess insurers contend—Truck had to pay $500,000 in addition to the $5,000 deductible paid by Kaiser. The trial court found that per the policy language, the $5,000 deductible operated to reduce Truck's indemnity obligation to $495,000. Excess insurers LMI and ICSOP cross- appeal the second issue.

We affirm on both Phase III-A issues.

## PHASE I: STATUTE OF LIMITATIONS

As noted above, Phase I addressed a statute of limitations issue. The parties adopted the Convention to address their uncertainty over the meaning of an "occurrence" under the policies, as it relates to per-occurrence limits and deductibles. When *LMI* resolved the question, the issue of accrual of claims for deductibles came to the fore. The trial court concluded the parties' unilateral reservations of rights to challenge the Convention tolled the running of the statute of limitations, presumably meaning Truck could recover unpaid deductibles for all past claims. Kaiser challenges this result, arguing Truck's claim for unpaid deductibles accrued when each claim was paid, and the statute was not tolled. This would mean that any claim for deductibles relating to claims where Truck made an indemnity payment more than four years before Truck filed its second amended complaint in August 2007 was untimely and barred by the statute of limitations. We agree with Kaiser and reverse and remand to the trial court for further proceedings consistent with this opinion.

## A. FACTUAL BACKGROUND

### 1. *Stipulated Facts*

In the trial court, Kaiser and Truck stipulated to the following facts relating to Phases I and II:

### a. Common Facts

Kaiser Cement and Gypsum Corporation ("Kaiser Cement") and its subsidiary Kaiser Gypsum Company ("Kaiser Gypsum," and with Kaiser Cement, "Kaiser") have been the subject of thousands of ABIC alleging exposure to asbestos-containing products manufactured by Kaiser Cement or Kaiser Gypsum.

Kaiser was issued primary insurance coverage, covering the period from 1947 to 1987, by four different insurance companies.[6]

_____

6    Three other insurance carriers issued primary insurance policies to Kaiser, but their policy limits have been exhausted. These policies were not at issue in Phase I. Fireman's Fund Insurance Company ("Fireman's Fund") issued primary insurance policies to Kaiser covering the period from January 1, 1947 through December 31, 1964. Fireman's Fund's aggregate policy limits have been paid, exhausting all of the limits of Fireman's Fund primary coverage that apply to ABIC as of April 30, 2004. Home Indemnity Company ("Home") issued primary insurance policies to Kaiser covering the period from April 1, 1983 through April 1, 1985. Home's aggregate policy limits of $2 million have been paid, exhausting all of the limits of Home primary coverage that apply to ABIC as of December 14, 1999. National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued primary insurance policies to Kaiser covering the period from April 1, 1985 through April 1, 1987. National Union's aggregate policy limits of $2 million have been

12

Truck issued primary CGL policies to Kaiser covering the period from December 31, 1964 through April l, 1983. Truck's policies provide coverage for bodily injury and property damage up to per occurrence limits of liability. For many—but not all— of the policy years, the policies also contain an annual aggregate limit for product liability claims:

    a. Truck's policies in effect from December 31, 1964 to January 30, 1971 have a $100,000.00 per person, a $300,000.00 per occurrence, and a $300,000.00 annual aggregate limit for all bodily injury products liability claims.

    b. Truck's policies in effect from January 30, 1971 to April 1, 1980 have per occurrence limits of $500,000.00 for bodily injury with no annual or other aggregate limits for products liability claims.

    c. Truck's policies in effect from April 1, 1980 to April 1, 1983 have per occurrence limits of $500,000.00 for bodily injury and $1,500,000.00 annual aggregate limits for products liability claims.

Each of the policies required Kaiser to assume a portion of the losses in the form of deductibles and loss adjustment expenses.

The policies defined "occurrence" as "an event, or continuous or repeated exposure to conditions which results in personal injury or property damage during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence."

---

paid, exhausting all of the limits of National Union primary coverage that apply to ABIC as of August 31, 2000.

Beginning in the late 1970s, Kaiser tendered ABIC, along with a number of early asbestos property damage claims, to Truck, which began defending against such claims and indemnifying Kaiser.

Kaiser's other primary insurers, Fireman's Fund, Home, and National Union, refused to participate. In February 1990, Kaiser and Truck filed suit against Fireman's Fund, Home, and National Union. Kaiser entered into three separate settlement agreements with the other primary insurers in 1992 and 1993.

Under those settlement agreements, Truck continued handling the defense of Kaiser's ABIC while each of the other three primary insurers contributed to both defense and indemnity for ABIC according to specific formulas set forth in the settlement agreements.

As a result of the exhaustion of the Fireman's Fund, Home, and National Union primary policy limits, Truck has been the only remaining primary insurer responding to ABIC as of April 30, 2004.

On April 30, 2001, Truck filed its initial complaint in this action, alleging its policy limits for ABIC were exhausted, and seeking a judicial declaration that Truck had no further obligation to defend or indemnify Kaiser for ABIC.

In 1981, Truck made the following assumptions regarding application of its policies to the ABIC filed against Kaiser: (a) California would adopt the "exposure theory" for triggering insurance coverage; and (b) all ABIC against Kaiser would be considered as arising out of one occurrence.

Prior to 1987, Truck had set up one claim file for each policy year. Truck did not allocate indemnity and expenses for any individual asbestos claimant to more than one policy year but

14

instead allocated payments to policy years by using a single date of loss to place the claimant within a single, specific policy year.

Beginning in approximately 1987, Truck established the Convention, under which it set up a master asbestos claim file for each policy year that broke down each indemnity payment and expense item (per claimant) into the number of years of exposure to Kaiser's product(s) and prorated it into each policy year.

Kaiser agreed to this allocation method for deductible billing purposes, as it was beneficial to Kaiser, but Kaiser reserved its rights to challenge Truck's allocation of indemnity payments later.

During this coverage action, which began in 2001, Kaiser has taken different positions on the number of occurrences giving rise to ABIC, including its allegations that ABIC arise from a single occurrence, and that ABIC arise from a small number of occurrences.

Until the January 2007 *LMI* decision, Truck and Kaiser both believed the number of occurrences arising from ABIC and Kaiser's per occurrence deductible obligation as called for under the Truck policies were unresolved questions of law that a court would ultimately have to decide.

### b. Facts Relating to Truck's Deductible Billings

Each of Truck's policies requires Kaiser to pay a deductible for each occurrence and, in most cases, a deductible for certain specified loss adjustment expenses. From December 31, 1964 through December 31, 1968, Kaiser was responsible for a $5,000.00 deductible per occurrence (per occurrence deductible) plus certain specified loss adjustment expenses. From January 1, 1968 through December 31, 1968, Kaiser was responsible for a

15

$15,000.00 "per-occurrence" deductible plus loss adjustment expenses. From January 1, 1969 through December 31, 1973, Kaiser was responsible for a $5,000.00 "per-occurrence" deductible plus certain specified loss adjustment expenses. From January 1, 1974 through December 31, 1975, Kaiser was responsible only for a $5,000.00 per occurrence deductible. From January 1, 1976 through March 31, 1981, Kaiser was responsible for a $50,000.00 "per-occurrence" deductible plus certain specified loss adjustment expenses. From April 1, 1981 through April 1, 1983, Kaiser was responsible for a $100,000.00 per occurrence deductible plus certain specified loss adjustment expenses.

Under the Convention Truck established in 1987, Truck charged and Kaiser paid one per occurrence deductible for the Truck policy years 1973-1983. Before this action was filed, Kaiser was charged by and had paid to Truck per occurrence deductibles of $420,000.00, allocated loss adjustment expense deductibles of $916,844.88, and unallocated loss adjustment expense deductibles of $59,500.00 for asbestos-related litigation. The $420,000.00 per occurrence deductibles were already credited to Kaiser. In the event Truck's 2007 billings for per occurrence deductibles are not barred by Kaiser's defenses, the allocated and unallocated expenses paid by Kaiser to Truck shall be credited to Kaiser. The expenses paid by Kaiser are subject to Truck's right to a credit, which Kaiser disputes, for $362,776.06 that Kaiser received as a result of the Fireman's Fund settlement agreement.

Effective July 1, 2004, Truck began allocating to Kaiser a pro-rata share of each ABIC settlement. As a result, Kaiser funded approximately 10 percent of ABIC settlement payments from July 1, 2004 through February 1, 2006.

In a letter dated August 31, 2004, Kaiser objected to Truck's allocation of indemnity payments to it. In its letter, Kaiser selected the 1974 or 1975 Truck policy years to respond to ABIC and cited *Aerojet, supra,* 17 Cal.4th 38 and *Armstrong, supra,* 45 Cal.App.4th 1, as a basis for its selection.

In October 2004, Truck sought summary adjudication on its claims that ABIC were a single occurrence, that Truck had paid the occurrence limits for each primary policy it issued to Kaiser, and that Truck thus had no further obligation to defend or indemnify Kaiser. (*LMI, supra,* 146 Cal.App.4th at pp. 652–653.)

When the trial court granted Truck's motion in January 2006, Truck withdrew all defense and indemnity for ABIC, effective February 1, 2006. Thereafter, Kaiser incurred 100 percent of defense and indemnity for each ABIC pending and settled after that date.

As noted above, in a January 9, 2007 decision, this court reversed the trial court's summary adjudication order, holding that an "occurrence" for purposes of determining per occurrence limits and deductibles meant "injurious exposure to asbestos," and it remanded the case to the trial court for a factual determination of how many "occurrences" gave rise to ABIC. (*LMI, supra,* 146 Cal.App.4th at pp. 651, 672.)

In a January 24, 2008 order, the trial court ruled that each asbestos-related bodily injury claim shall be deemed to have been caused by a separate and distinct occurrence within the meaning of the Truck policies.

Following the January 2007 *LMI* decision, Truck acknowledged it owed Kaiser a complete defense and indemnity under its 1974 policy, retroactive to July 1, 2004, and resumed the defense and indemnity of ABIC as of September 1, 2007.

17

Kaiser had paid $25,988,284.05 in defense costs and $51,464,477.35 in indemnity costs between July 1, 2004 and September 1, 2007 for ABIC that were covered under Truck's 1974 policy.

By letter dated July 23, 2007, Truck calculated, billed and—from amounts it otherwise owed to Kaiser at that time— withheld various sums from its reimbursement payment, including $9,521,158.50 in per occurrence deductibles under the 1974 policy that Truck claimed it was owed by Kaiser.

Since its July 23, 2007 billing, Truck has continued to bill Kaiser for a separate per occurrence deductible on each ABIC resolved with payment. Truck billed Kaiser $1,264,000.00 on August 12, 2009 (which Kaiser paid on September 10, 2009), and $2,245,500.00 on October 4, 2013 (which Kaiser has not yet paid).

Truck's July 23, 2007 per occurrence deductibles billing was the first time Truck asked Kaiser to pay a separate deductible for each claimant, and Kaiser did not object to Truck's per occurrence deductible billing on grounds it was untimely until after July 23, 2007.

The Truck policy issued to Kaiser effective January 1, 1974 contains the following language concerning Kaiser's obligation to pay a deductible to Truck: "$5,000 shall be deducted from the total amount to be paid for all damages which the Insured becomes legally obligated to pay on account of each occurrence."

Truck filed its second amended complaint in this action on August 23, 2007, alleging for the first time (in paragraph 51) that Kaiser owed a separate per occurrence deductible for each ABIC.

For the 1,472 ABIC resolved with payment before August 23, 2003, four years before Truck filed its second amended complaint, Truck withheld deductibles on July 23, 2007 from its

18

payment for Kaiser's reimbursement in the amount of $6,629,391.00.

For the 802 ABIC resolved with payment before October 1, 2000, four years before Truck filed its first amended complaint for declaratory relief, Truck withheld deductibles on July 23, 2007 from its payment for Kaiser's reimbursement in the amount of $3,235,496.00.

For the 426 ABIC resolved with payment before April 30, 1997, four years before Truck filed its original complaint for declaratory relief, Truck withheld deductibles on July 23, 2007 from its payment for Kaiser's reimbursement in the amount of $1,657,003.50.

### c. Facts Relating to Truck's Equitable Allocation

#### i. *Kaiser's Asbestos Claims*

Kaiser manufactured asbestos-containing products at 10 different facilities from the 1940s through the 1970s. (*LMI, supra,* 146 Cal.App.4th at p. 652.) Sometime in the late 1970s, Kaiser began to tender to Truck bodily injury claims resulting from exposure to Kaiser's products containing asbestos. By October 2004, more than 24,000 claimants had filed products liability actions against Kaiser, and Truck's indemnity payments exceeded $50 million.

#### ii. *Commencement of This Action*

In April 2001, Truck filed a declaratory relief action asserting its aggregate limit policies (1965-1970 and 1980-1983) were exhausted, it paid all applicable per occurrence limits on the non-aggregate limit policies, and thus had no further duty to indemnify Kaiser for asbestos claims. This initial complaint did not

19

make any allegations concerning deductibles. Kaiser cross-claimed, alleging that all the asbestos claims arose from one occurrence and sought a declaration that it was responsible for only one deductible. Kaiser also sought a declaration of coverage under the excess policies in the event the Truck policies were deemed exhausted. (*LMI, supra,* 146 Cal.App.4th at p. 652.)

## B.    THE CONVENTION

As noted above, in the 1980s, when Kaiser began to receive asbestos claims, California law did not define what constituted an "occurrence" with respect to ABIC. Before 1987, Truck set up one claim file for each policy year, but did not allocate payments for any individual claimant to more than one policy year. Instead, Truck used a single date of loss.

Beginning in 1987, Truck adopted the Convention pursuant to which Truck set up a "master" claim file for each policy. Truck broke each of Kaiser's asbestos claims into indemnity and expenses and allocated it across the number of years of exposure to Kaiser's products, thereby prorating it into each applicable policy year. Under the Convention, Kaiser paid one deductible per policy year for the policy years 1973-1983, rather than one deductible per occurrence.[7]

---

7    The trial court observed in its Phase I Statement of Decision that the Convention benefitted both parties. *LMI* explained, "[u]nder the 1964 policy, Kaiser was responsible for the first $5,000 of loss for each 'occurrence'; by 1981, the per occurrence deductible was $100,000. Thus, Kaiser's share of the total asbestos liability increases as the number of occurrences increases. Additionally, although asbestos claims against Kaiser collectively exceed tens of millions of dollars, many individual

Although the parties adhered to the Convention, they never reached an express agreement concerning the definition of "occurrence" and hence a final resolution of how deductibles would be allocated. Instead, during the time the Convention was in effect, the parties agreed it was an interim arrangement not in writing, and that the definition of an "occurrence" was an unresolved question of law.

As noted above, at the time the Convention was initiated, what constituted an "occurrence" for purposes of calculating per occurrence limits and per occurrence deductibles with respect to ABIC was an open legal question. Thus, Truck and Kaiser were uncertain of how to bill the losses and how to calculate any deductibles. Testimony at the Phase I trial showed Truck instigated the Convention and Kaiser, under a unilateral reservation of rights, agreed to the Convention's procedure for deductible billing purposes because it benefitted from it.

For example, in a June 1991 letter concerning deductible billings, Kaiser stated that "Kaiser hereby reserves its right to further consider and, as may be appropriate with respect to policy terms and conditions, to challenge the convention established by

---

claims apparently are within the applicable deductibles. Thus, if each claim is treated as a separate occurrence, Kaiser may have no coverage for a substantial number of claims." (*LMI, supra,* 146 Cal.App.4th at p. 653, fn. 2.) In addition, the Convention benefitted Truck's reinsurers because if Truck's indemnity payments were based upon a separate occurrence for each claimant, the payments would likely not implicate the reinsurers' obligations because most asbestos claims would be settled for small amounts. Under Truck's reinsurance agreement Truck paid $150,000 for each occurrence and the reinsurers paid everything in excess of that.

[Truck] of combining all asbestosis claims into one master claim per policy period[.]" Kaiser's general counsel Carl Pagter stated that under the Convention, the parties treated the deductible as arising from a single claim. The parties recognized the issue was open until decided by a court. Kaiser, however, realized at some time in the future the legal issue of what constituted an occurrence would be decided.

Truck acquiesced (as stated by Truck employee Dennis Patterson) that "there was a general understanding that this was a mutually agreed-upon method of allocating and billing for Kaiser's asbestos claims, and that if, . . . the case law changed, that we may have to do it some different way. So I think there was always an understanding that both parties reserved the right." Truck sought and received concurrence in the Convention from its reinsurers.

During the course of this coverage action, Kaiser took different positions on the number of occurrences giving rise to asbestos claims, including the position that such claims arose from a single occurrence, or that asbestos claims arose from a small number of occurrences.

Effective July 1, 2004, Truck began allocating to Kaiser a pro-rata share of each asbestos settlement. As a result, Kaiser funded approximately 70 percent of settlement payments from July 1, 2004 through February 1, 2006.

### 1. *Truck's October 2004 Summary Judgment Motion*

In October 2004, Truck sought summary judgment on its exhaustion claim. (*LMI, supra,* 146 Cal.App.4th at p. 652.) Truck argued the per occurrence limit in the policies capped its liability for injuries arising from any one occurrence. (*Ibid.*) Furthermore, it argued, because it had paid the occurrence limits for each primary

22

policy, it had no further indemnification obligation to Kaiser. (*Id.* at p. 653.) Truck based this argument on the Convention's one-occurrence-per year-structure and on its assertion that the occurrence was "'the design, manufacture and distribution by Kaiser and its subsidiaries of asbestos-bearing products,'" rather than each claimant's exposure to asbestos. (*Ibid.*) As a result, it contended the indemnity payments made exceeded the per occurrence limits in the policies. (*Ibid.*) Truck also relied on the parties' course of conduct in paying a single deductible per policy year and asserted this conduct supported its interpretation of the policies. (*Ibid.*) Kaiser agreed the asbestos claims resulted from a single annual occurrence, but contended that neither it nor Truck ever believed they reached an agreement on the number-of-occurrences issue and that Kaiser retained the right to challenge it. (*Ibid.*)

The trial court granted Truck's motion, finding that "as a matter of law, . . . the manufacture and decision to place asbestos into products by the Kaiser entities constituted a single occurrence under the applicable policies." (*LMI, supra,* 146 Cal.App.4th at p. 655.) The trial court concluded the policies were exhausted. (*Ibid.*) After the trial court's January 2006 ruling, Truck withdrew its defense and indemnity from Kaiser as of February 1, 2006.

### 2. *The LMI Decision and the Meaning of an "Occurrence"*

As noted above, in *LMI*, this court disagreed with the trial court's summary judgment ruling on the "occurrence" issue, and rejected Truck's position. (*LMI, supra,* 146 Cal.App.4th at pp. 651, 672.) After noting that the dispute centered on the policies dating from 1971 to 1980 (which contained no aggregate limits, only per occurrence limits), this court held each "occurrence" under the

23

policy was the claimant's exposure to Kaiser's asbestos containing products, not Kaiser's manufacture of asbestos containing products. (*Id.* at pp. 660.) "[W]e conclude that the parties did not understand or intend 'event' to mean "'anything that happens,'" including 'the conscious inclusion of asbestos in products manufactured and distributed by the policyholder.' . . . . Instead, we conclude that the parties intended 'event' to mean an identifiable, single injury-causing episode—an 'accident' under the older CGL form—as distinct from 'continuous or repeated exposure.'" (*Id.* at p. 662.) The case was remanded for a factual determination of the number of occurrences. (*Id.* at p. 672.)

Following *LMI,* Truck resumed its indemnity obligations to Kaiser retroactively to July 1, 2004. Also based on *LMI,* Truck filed its second amended complaint in August 2007, asserting it was entitled to payment of a separate deductible for each asbestos claim it had paid or would pay, and that this method of deductible assessment accrued with the 2007 *LMI* decision. This was the first time Truck assessed a deductible for each claimant, and Truck withheld $9,521,158.20 in per occurrence deductibles from amounts owed to Kaiser. This included $6,629,391.00 in deductibles that predated Truck's second amended complaint by more than four years.

In response to Truck's assessment of the deductibles, Kaiser filed a third amended cross-complaint, asserting Truck had not exhausted the policy limits for asbestos claims, Kaiser was entitled to select an insurance policy during any triggered policy year pursuant to *Armstrong,* and Kaiser was only responsible for the deductible and/or loss expenses per the policies.

In January 2008, pursuant to the holding of *LMI,* the trial court confirmed that each asbestos claim would be deemed to have been caused by a separate occurrence.

## C.    PHASE I TRIAL

Kaiser asserted Truck's claims for deductibles accrued at the time each claim was paid, and not with the January 2007 decision in *LMI.* As a result, Kaiser contended any claim for a deductible assessed more than four years before Truck's August 23, 2007 second amended complaint was untimely under the four-year bar of Code of Civil Procedure section 337. Truck asserted that Kaiser's acquiescence in Truck's billing Convention and the parties' respective reservations of rights with respect to the deductible in effect barred any statute of limitations defense.

### 1.    *Evidence*

The Phase I trial commenced in November 2014 and addressed the issue of when Truck's claim for unpaid deductibles accrued under the policies as interpreted by *LMI*. The trial was conducted based upon stipulated facts, documentary evidence, and deposition testimony.

### 2.    *Trial Court Ruling*

In its statement of decision, the trial court identified a "breach" as the non-payment of a per occurrence deductible under the 1974 policy. The trial court reasoned the parties were operating under the Convention, treating each claim as arising from one occurrence, and billing one deductible per policy year. The court observed that with respect to the right to challenge the deductible calculation, the parties agreed "*both sides were willing to go along without prejudice to each other's rights in the future*." Further, each

25

party believed the calculation, whether annual or per occurrence, was an unresolved question of law resulting from ambiguities in the policy. Finally, Kaiser did not challenge the Convention before 2007.

As a result, the trial court concluded that deductibles for individual claims "could not have been 'available' until this critical issue had been decided by the Court of Appeal [in *LMI*], and could not have accrued until that time." The trial court observed that *LMI* identified the issue— "the meaning of 'occurrence'" in a CGL policy "as applied to bodily injuries caused by exposure to asbestos"—as one of "first impression."

The trial court found there was no consequence to the lack of a tolling agreement because one would only have been required if the claims had in fact accrued before *LMI*. Even if the statute of limitations began to run at a time earlier than *LMI,* the court found the parties' reservation of rights essentially operated as a tolling agreement. Because it determined the claim did not accrue until *LMI,* the trial court found equitable estoppel did not apply and the question of waiver was moot. "The weight of evidence before the court shows that both Truck and Kaiser were always operating under the assumption that the convention controlled the number of occurrences, and hence, the number of deductibles— notwithstanding the mutual view held by both parties that the 'number of occurrences' issue was unresolved and would ultimately have to be decided by the courts."

Finding the parties did not dispute Truck's calculation of $9,521,158.50 in offsets, the trial court ruled Truck properly assessed deductibles Kaiser owed for all claims settled before August 23, 2003 (four years before the filing of Truck's second amended complaint).

26

## D.    STANDARD OF REVIEW

Where, as here, the relevant facts are undisputed, it is a question of law whether a claim is barred by the statute of limitations. Accordingly, we apply the de novo standard of review. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.)

## E.    DISCUSSION

### 1.    *Truck's Claim for Deductibles Accrued When Truck Paid or Otherwise Resolved Each Claim*

The parties dispute when the claim for each deductible accrued. Kaiser asserts it was when each deductible was or could have been assessed on a claim. Truck asserts its claims did not accrue until *LMI* defined an "occurrence." We agree with Kaiser.

The statute of limitations is a legislatively prescribed time period to bring a cause of action. (*Gilkyson v. Disney Enterprises, Inc.* (2016) 244 Cal.App.4th 1336, 1341.) It aims to promote the diligent assertion of claims and "'ensure defendants the opportunity to collect evidence while still fresh,'" while providing "'repose and protection from dilatory suits once excess time has passed.' [Citation.]" (*Ibid.*) "Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. [Citations.]" (*Norgart v. Upjohn* Co. (1999) 21 Cal.4th 383, 397.)

For breach of a written contract, the period is four years from the time the claim accrues. (Code Civ. Proc., § 337.) The elements of a cause of action for breach of contract are: the contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the resulting damages to plaintiff. (*Coles v. Glaser*

27

(2016) 2 Cal.App.5th 384, 391.) Generally, a claim for breach of contract accrues when all these elements have occurred. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 815 [statute of limitations runs from occurrence of the last element essential to the cause of action].) To determine whether a breach has occurred, we look to the terms of the contract. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811.)

Pursuant to the language of the policies, "$5,000 shall be deducted from the total amount to be paid for all damages which the Insured becomes legally obligated to pay on account of *each occurrence*." (Emphasis added.) Thus, Truck's claim for a deductible accrued when Truck became obligated to indemnify Kaiser and assess a deductible. (See, e.g., *Specialty Nat'l Ins. Co. v. U-Save Auto Rental of Am., Inc.* (M.D. Fla. Nov. 12, 2008, Civ. A. No. 8:07-cv-878-33MAP) 2008 U.S.Dist. Lexis 94931, pp. 15–16 (*Specialty*).) *Specialty* involved the timeliness of an insurer's suit for unpaid deductibles. (*Id.* at p. 8.) The insurer argued it could not have brought suit against the insured until it demanded reimbursement of the deductibles and the insured refused payment, because at that time the insurer would be damaged. (*Id.* at pp. 11–12.) *Specialty* held the deductibles claim accrued when the insurer settled the claims—nothing in the contract prevented the insurer from demanding payment at any time. Its claim for deductibles due before the statute of limitations bar date was therefore untimely. (*Id.* at pp. 17–18) The court observed that statutes of limitation were designed to prevent parties from sleeping on their rights. (*Id.* at p. 17.) Similarly, *Hahn Automotive Warehouse, Inc. v. Am. Zurich Ins. Co.* (2012) 18 N.Y.3d 765, 768-769 [967 N.E.2d 1187] (*Hahn*) involved the inadvertent failure to bill for deductibles not discovered until an audit performed six years after the statute of

28

limitations had expired. *Hahn* held the claim accrued with the right to demand payment. (*Id.* at pp. 770–771.)

Under this authority, and Truck's policy language, Truck's claim for deductibles arose at the time it first made indemnity payments for a claim, whether by settlement or judgment, unless the parties agreed to toll the statute of limitations or there was a waiver of the statute of limitations by Kaiser.

### 2.     LMI *Did Not Revive Stale Claims*

Kaiser asserts *LMI* was retroactive and did not create a new deductible claim or revive old claims. According to Kaiser, Truck always had the ability to charge Kaiser a deductible for each ABIC under the language of its policies; *LMI* did not create that right. We agree.

"'The general rule is that judicial decisions are given retroactive effect. [Citation.] Departure from that rule is limited to those narrow circumstances in which considerations of fairness and public policy preclude retroactivity. . . .' [Citation.]" (*Doe v. San Diego-Imperial Council* (2015) 239 Cal.App.4th 81, 90.) "The exception to the principle of retroactivity is inapplicable where . . . a court is deciding a legal question in the first instance, rather than overturning prior appellate decisions. [Citation.]" (*Id.* at p. 91; see also *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 573 [judicial decision retroactive where party "cannot claim reasonable reliance on settled law."].)

Here, *LMI* decided an issue of first impression. (*LMI, supra,* 146 Cal.App.4th at p. 651 [the meaning of "occurrence" as used in per occurrence limits and deductibles in a CGL policy as applied to bodily injuries caused by exposure to asbestos is "an issue of first impression in this state."].) Truck, therefore, could not have reasonably relied on contrary authority prior to the decision in *LMI*

29

because no such authority existed. Accordingly, we agree with Kaiser that the holding in *LMI* ("occurrence" as used in the policies at issue with respect to per occurrence limits and deductibles means injurious exposure to asbestos) applies retroactively.

### 3. A "Reservation of Rights" Did Not Toll the Four-Year Statute of Limitations

#### a. A Reservation of Rights, Without More, Is Not a Tolling Agreement

We reject Truck's assertion that the reservation of rights tolled the running of the statute of limitations.[8] A statute of limitations may be tolled by express agreement of the parties. (See, e.g., *Wind Dancer Production Group v. Walt Disney Pictures* (2017) 10 Cal.App.5th 56, 79.) Here, there is no such express

---

8      Reservations of rights commonly occur in the insurance context when an insurer notifies its insured that it will furnish a defense to the injured party's suit against the insured but at the same time reserves the right to refuse to indemnify the insured against any judgment on the ground that the claim was not covered under the policy, and to withdraw its defense upon the same ground. (*Truck Ins. Exchange v. Superior Court* (1996) 51 Cal.App.4th 985, 994.) Such a reservation of rights prevents waiver of coverage defenses: the insurer meets its obligation to furnish a defense without waiving its right to assert coverage defenses against the insured later. (*Blue Ridge Ins. Co. v. Jacobsen* (2001) 25 Cal.4th 489, 497–498.) Thus, in that context a reservation of rights is used to separate the insurer's indemnity obligation from its defense obligation and does not involve the statute of limitations because the insured's claim has already accrued at the time of litigation and the statute is no longer running. Such an open-ended reservation of rights in that context has no effect upon the statute of limitations.

agreement, and furthermore, the record does not demonstrate the parties agreed to such an implied term. "'The only distinction between an implied-in-fact contract and an express contract is that, in the former, the promise is not expressed in words but is implied from the promisor's conduct. [Citations.] Under the theory of a contract implied in fact, the required proof is essentially the same as . . . [on an] express contract, with the exception that conduct from which the promise may be implied must be proved. [Citation.]'" (*Chandler v. Roach* (1957) 156 Cal.App.2d 435, 440, emphasis omitted.) Indeed, the record is silent on whether the parties intended to toll or waive any statute of limitations with respect to the deductibles. At most, the evidence presented details the parties' understanding of the Convention and its purpose and effect. Other than the parties' joint realization that at some point the law would be clarified, there is nothing further. This is consistent with the fact that the Convention was, in the words of Kaiser, "not really an agreement" but merely a procedure under which they agreed to operate.

Nonetheless, Truck asserts that final collection of the deductibles was tolled until the time for performance ripened with *LMI's* ruling on the definition of an "occurrence." Because deductibles would have normally accrued with the settlement of each claim, Truck asserts the reservation of rights rendered the policies executory contracts because each deductible was subject to later change. (See Civ. Code, § 1661 [executed contract is one in which the object has been fully performed; all others are executory]; *State Comp. Ins. Fund. v. WallDesign, Inc.* (2011) 199 Cal.App.4th 1525, 1529-1530 [statute of limitations does not run on an executory contract until the time for full performance has

31

arrived.].) Thus, Truck argues the time for "full performance," namely, identification of the method of deductible assessment as being per-claim, and accrual of the statute of limitations, did not occur until the 2007 *LMI* decision.

Because Truck's approach reads the Convention too broadly and finds no support in the record, we disagree. Truck relies on *Schuler v. Community First National Bank* (Wyo. 2000) 999 P.2d 1303 for the proposition that "[a]s a general rule, if the parties mutually adopt a mode of performing their contract differing from its strict terms or if they mutually relax the contract's terms by adopting a loose mode of executing them, neither party can go back upon the past and insist upon a breach because the contract was not fulfilled according to its letter. [Citation.]" (*Id.* at p. 1305, fn. 1; see also *Ghirardelli v. Peninsula Properties Co.* (1940) 16 Cal.2d 494, 498 (*Ghirardelli*) [where parties agreed no payment due until account of trustee rendered, statute of limitations did not run].) That is not the case here. We see no reason why the parties, had they actually agreed to toll the statute of limitations, would not enter into a written agreement to that effect or bring a declaratory relief action. Further, unlike *Ghirardelli,* there was no agreement to defer performance.

### b. *The Discovery Rule Does Not Apply*

In an attempt to avoid this result, Truck asserts the discovery rule and claims it only discovered after *LMI* that it was injured by the Convention and thus the four-year statute of limitations did not begin to run until *LMI*. (See, e.g., *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 831 [in breach of contract action, claim accrued when plaintiffs discovered they were harmed].) The discovery rule "may be applied to breaches [of contract] which can be, and are, committed in secret

32

and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time." (*Id.* at p. 832; *Gryczman v. 4550 Pico Partners, Ltd.* (2003) 107 Cal.App.4th 1, 5 [discovery rule applicable to breach of contract action where defendant "not only breached the contract 'within the privacy of its own offices' but the act which constituted the breach . . . was the very act which prevented plaintiff from discovering the breach."].)

Under the discovery rule, the plaintiff must show that, "despite diligent investigation of the circumstances of the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 809.)

But the discovery rule applies to ignorance of the facts, not the law. (*Love v. Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1144-1145 [knowledge of the facts, rather than knowledge of available legal theories or remedies, starts the statute of limitations].) Our Supreme Court's decision in *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103 (*Jolly*) is closely on point. In *Jolly*, the plaintiff delayed bringing suit for injuries resulting from her mother's use of diethylstilbestrol (DES), while plaintiff was *in utero,* because she could not identify and name the specific manufacturer of the drug supplied to her mother. (*Id.* at pp. 1107–1108.) Appellate case law prevailing at the time plaintiff discovered the facts creating her cause of action held a plaintiff must identify the manufacturer of the drug. (*Id.* at pp. 1114, 1116.) In *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588 (*Sindell*), however, our Supreme Court held a plaintiff who was harmed by DES and who was unable to identify the particular manufacturer could state a cause of action by joining defendants that manufactured a

33

substantial percentage of the market for the drug. (*Id.* at pp. 612–613; *Jolly, supra,* at p. 1108.) In *Jolly,* the plaintiff filed her complaint less than one year after *Sindell*, but more than one year after her action would ordinarily be deemed to have accrued. (*Jolly, supra*, at pp. 1108, 1113–1114.) She therefore attempted to avoid the bar of the one-year statute of limitations by arguing that the issuance of the court's opinion in *Sindell* was what started the limitations period running. (*Jolly*, *supra*, at p. 1114.) The *Jolly* court rejected her argument, holding the decision in *Sindell* did not constitute a "fact" that activated the one-year statute of limitations: "*Sindell* demonstrated the legal significance of facts already known to plaintiff. The statute had started to run for plaintiff well before *Sindell* was decided." (*Jolly*, *supra*, at p. 1115.)

Like the plaintiff in *Jolly*, Truck was fully informed of the facts, precluding application of the discovery rule. The only unknown was the legal issue of how California courts would construe "occurrence" with respect to calculating deductions for ABIC. Truck's argument incorrectly asserts that uncertainty about a legal issue has the same effect as ignorance of factual issues, such as the existence of an injury.

### c. There Is No Equitable Tolling

Truck further asserts that under the doctrine of equitable tolling, the statute of limitations did not run because Kaiser obtained the benefits of lower deductible payments and it cannot equitably avoid the burdens of *LMI*. Equitable tolling has no place here. Equitable tolling is a judicially created, nonstatutory doctrine that suspends or extends a statute of limitations as necessary to ensure fundamental practicality and fairness. (*Saint Francis Memorial Hospital v. State Dept. of Public Health* (2020) 9 Cal.5th 710, 716–717.) "The doctrine applies 'occasionally and in special

situations' to 'soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court.' [Citation.]" (*Id.* at pp. 719–720.) There is no reason to apply the doctrine where, as here, the parties were fully aware that controlling law was uncertain, were sophisticated and assisted by competent counsel, and could have protected their right to bring suit by either bringing suit or executing a tolling agreement.

### d.    *Kaiser is Not Equitably Estopped to Assert the Statute of Limitations*

Finally, Kaiser is not equitably estopped to assert the bar of the statute of limitations merely because it agreed to the Convention. The doctrine of equitable estoppel is founded on principles of equity and fair dealing. (*Krolikowski v. San Diego City Employees' Retirement System* (2018) 24 Cal.App.5th 537, 564.) It provides that a party may not deny the existence of facts if that party has intentionally led others to believe a particular circumstance to be true and to rely upon that belief to their detriment. (*Ibid.*) "'"'Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he [or she] must intend that his [or her] conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he or she must rely upon the conduct to his [or her] injury.'" . . .' [Citation.]" (*Id.* at pp. 564–565.) Nothing in the record supports an assertion that Truck was unaware of the true state of the relevant facts. Moreover, Truck knew the Supreme Court had yet to define "occurrence" in the context of calculating deductibles for ABIC.

35

### 4. Code of Civil Procedure Section 360.5 Requires a Writing, Renewed Every Four Years, for Waiver of the Statute of Limitations

Kaiser correctly notes that waiver of the statute of limitations cannot, as Truck asserts, be created by implication. Code of Civil Procedure section 360.5 states, in relevant part: "No waiver shall bar a defense to any action that the action was not commenced within the time limited by this title unless the waiver is in writing and signed by the person obligated. No waiver executed prior to the expiration of the time limited for the commencement of the action by this title shall be effective for a period exceeding four years from the date of expiration of the time limited for commencement of the action by this title and no waiver executed after the expiration of such time shall be effective for a period exceeding four years from the date thereof, but any such waiver may be renewed for a further period of not exceeding four years from the expiration of the immediately preceding waiver."

Truck's reliance on *Don Johnson Productions, Inc. v. Rysher Entertainment LLC* (2012) 209 Cal.App.4th 919 (*Don Johnson*) is misplaced. Truck relies on *Don Johnson* for the proposition that an "equitable tolling agreement can exist independent of a written waiver of the statute of limitations." In *Don Johnson,* the court held section 360.5 applies to waivers of the statute of limitations, not tolling agreements; thus, it was not necessary for the parties to renew their written tolling agreement after four years. (*Don Johnson, supra,* at p. 930.) Here, however, as discussed in sections E.3.a and E.3.c, *ante,* there is no evidence in the record that the parties intended to toll the statute of limitations, and, in any event, there is no reason to apply the equitable tolling doctrine here.

Accordingly, for the statute of limitations to permit the assertion of pre-2003 claims, Kaiser must have affirmatively and in writing waived the statute. The record contains no such written waiver.

### 5. Truck's Claimed Setoff Can Apply Only to Those Deductibles Not Barred by the Statute of Limitations

#### a. Factual Background and Trial Court Ruling

In its Third Amended Complaint, Truck's first cause of action sought a declaratory judgment "that it must pay a net total of its per[ ]occurrence limit minus the applicable deductible for any ABIC, and that it is not liable to Kaiser . . . for any additional amounts." In its answer to Kaiser's Third Amended Cross Complaint, Truck asserted as its tenth affirmative defense that "[t]o the extent Truck may be held liable to Kaiser, Truck is entitled to set off from any such liability amounts owed to Truck by Kaiser." In its Phase I trial brief, Truck alleged that "[w]ith no breach and no statute of limitations bar, Truck was entitled to offset the full $9,521,158.50 for a $5,000 deductible per ABIC under the 1974 policy. Truck acknowledges that with this outcome it owes Kaiser $613,968.82, in reimbursement for allocated and unallocated expenses Kaiser had paid under policies other than the 1974 policy. . . . Thus, [Truck asserts,] because [it] was entitled to offset the whole $9,521,158.50 in deductible billings, [it] owes Kaiser [only] $613,968.82, representing allocated and unallocated loss expenses Kaiser previously paid Truck." The trial court found Truck's setoff claim "could not have been 'available' until [*LMI*] and could not have accrued until that time." The court concluded that Truck properly offset amounts for ABIC settled before 2003.

37

### b. Truck's Setoff Claim Does Not Revive Stale Deductible Claims But Only Permits Offset Against Post-2003 Deductibles

Both parties assert waiver with respect to the setoff issue. Truck asserts Kaiser's failure to address the setoff nature of its deductible claim waives its limitations period argument, which operates differently for a setoff defense, while Kaiser argues Truck did not raise the setoff issue at trial. As discussed above, the record demonstrates the issue was raised by both parties and ruled on by the trial court.

In any event, Truck's setoff claim does not revive pre-2003 deductibles or permit the parties to revisit those claims in any fashion. Code of Civil Procedure section 431.70 allows the offsetting of cross-demands that have coexisted at some point in time, notwithstanding that one of the claims is now barred by the statute of limitations. (*Jones v. Mortimer* (1946), 28 Cal.2d 627, 633; *Sunrise Produce Co. v. Malovich* (1950) 101 Cal.App.2d 520, 523 [applying previous version of section 431.70].) Section 431.70 provides that where cross-demands for money exist between plaintiff and defendant, defendant "may assert in the answer the defense of payment."[9] In general, a setoff prevents the superfluous

---

9 Code of Civil Procedure section 431.70 provides: "Where cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other, notwithstanding that an independent action asserting the person's claim would at the time of filing the

exchange of money between parties and is asserted at the end of litigation. (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th. 480, 500.) The affirmative defense of setoff is equitable in nature. (*Granberry v. Islay Investments* (1995) 9 Cal.4th 738, 743–744.)

Code of Civil Procedure section 431.70 does not toll running of statutes of limitations, but permits assertion of setoff—if at the time of the assertion of underlying claim—the statute of limitations has not run. (See *Safine v. Sinnott* (1993) 15 Cal.App.4th 614, 618-619.) In this context, a defendant may use setoff only "defensively to defeat the plaintiff's claim in whole or in part[,]" but may not use setoff offensively as an independent basis for relief. (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 197–198.) "[T]o the extent a defendant seeks affirmative relief, the applicable statute of limitations applies to the defendant's [setoff] claim, just as it would if the defendant were asserting its claim in an independent action." (*Id.* at p. 198)

The trial court's calculations were based upon its finding that none of the deductibles were time-barred. As we have concluded Truck may not revisit pre-August 2003 deductibles because they are time-barred, Truck cannot rely on Code of Civil Procedure section 431.70 to revive these claims. Truck may, however offset against deductibles accruing after 2003; such deductibles must be recalculated as per occurrence deductibles.

---

answer be barred by the statute of limitations. If the cross-demand would otherwise be barred by the statute of limitations, the relief accorded under this section shall not exceed the value of the relief granted to the other party."

## F.     Conclusion

Truck's withholding of deductibles in the amount of $6,629,391 for the 1,472 ABIC claims resolved before August 23, 2003 was improper; Truck's claim to recover those deductibles is time-barred. Accordingly, the portion of the final judgment relating to Phase I, in which the trial court rendered judgment "in favor of plaintiff and cross-defendant Truck and against defendant and cross-complainant Kaiser with respect to Truck's Third Amended Complaint (for Declaratory Relief) and Kaiser's Fourth Amended Cross-Complaint according to the Phase One Decision" is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

## PHASE II: ALLOCATION TO NON-1974 PRIMARY POLICIES

In Phase II, Truck sought an order permitting it to allocate defense and indemnity payments for claims under its 1974 primary policy (which has no aggregate limit) across all of its triggered primary policies, including those with aggregate limits. The trial court denied relief. The issue on appeal is whether, consistent with *Armstrong,* Truck can obtain what is essentially intra-insurer contribution from itself.

As noted above, *Armstrong* holds that once a policy is triggered, the policy obligates the insurer to pay "all sums" which the insured shall become liable to pay as damages. (*Armstrong, supra,* 45 Cal.App.4th at p. 105.) With a long-tail injury, this may include damages attributable to other policy periods. (*Ibid.*) In that case, the insured may elect to seek indemnity under a single policy with adequate policy limits, and if such policy covers "all sums" for which the insured may be liable, the insurer may be

held liable up to the policy limits. (*Id.* at p. 50.) An insured may obtain full indemnification and defense from one insurer, leaving the selected insurer to seek equitable contribution from other insurers covering the same loss. (*Id.* at p. 52.) Kaiser selected Truck's 1974 no-aggregate limits policy under *Armstrong*.

*ICSOP* addressed the scope of ICSOP's obligations as excess insurer to the *Armstrong*-selected 1974 policy and the attachment point of ICSOP's excess policies. (*ICSOP, supra,* at pp. 20–21.) As explained below, the *ICSOP* decision was the starting point for Truck's arguments in Phase II.

At the Phase II trial, Truck asserted it could allocate indemnity to its other policy years—apparently to access reinsurance funds associated with those other policies and access excess insurance above those policies. Kaiser, on the other hand, believed Truck's proposal would disadvantage it because it would exhaust the aggregate-limit policies, and perhaps the excess policies above them, thereby reducing the amount of insurance available to Kaiser and the asbestos claimants. The trial court refused to grant Truck the relief it sought. We affirm.

## I. FACTUAL BACKGROUND

As noted above, in July 2004, Truck started to allocate to Kaiser a pro-rata share of each asbestos settlement, resulting in Kaiser shouldering approximately 70 percent of the settlement payments during the period from July 1, 2004 to February 1, 2006. Kaiser responded to Truck's action by selecting the no-aggregate limit 1974 policy pursuant to *Armstrong* to respond to asbestos claims, asserting Truck was obligated to indemnify it for "all sums" due.

Following the *LMI* decision in 2007, Truck's Second Amended Complaint asserted the right to equitably allocate

41

payments for each occurrence among all triggered Truck policies. Kaiser's Third Amended Cross-Complaint asserted that ICSOP, which provided excess insurance to the Truck 1974 policy, was responsible to pay all amounts in excess of the 1974 policy's per occurrence limit of $500,000.

## A.    The 2013 *ICSOP* Decision

In *ICSOP*, Kaiser argued that after the 1974 Truck policy responded to an individual claim by paying its per occurrence limit of $500,000, *ICSOP* was obligated to indemnify Kaiser for amounts in excess of $500,000 up to the $5,000,000 per occurrence limit of the ICSOP policy. (*ICSOP, supra,* pp. 6–7.) ICSOP, on the other hand, argued that because the ABIC potentially trigger up to 19 policy periods, "the policy limits for these 19 separate policy periods must be 'stacked'[10] such that 'not only must the Truck $500,000 [per occurrence] limit in the 1974 policy period be exhausted, but so must all of Truck's primary limits in its other eighteen annual policy periods'" before its policy attached.  (*Id.* at pp. 15, 34.) Thus, ICSOP argued, while the 1974 primary policy has been exhausted as to many claims that exceed the $500,000 per occurrence limit, primary policies for other years remain unexhausted. (*Id.* at pp. 22–23.) ICSOP contended that it has "no indemnity obligations with regard to any asbestos bodily injury claims until the per occurrence limits

---

10     "Stacking" occurs when more than one policy is triggered by an occurrence. Each policy year can be called upon to respond to the claim up to the full limits of that policy. The limits of each policy triggered by an occurrence are added together to the determine the amount of coverage available for the claim. (*ICSOP, supra,* at p. 10, fn. 4.)

42

of *each* of Truck's annual policies . . . have been exhausted." (*Id.* at p. 23, original emphasis.)

In *ICSOP*, this court determined that horizonal exhaustion applied to the primary policies, in the sense that ICSOP's excess policy did not attach until all collectible primary policies were exhausted. (*ICSOP, supra,* at p. 24.) Thus, ICSOP's excess liability was "excess to all other collectible primary insurance—whether for 1974 or any other year[.]" (*Id.* at p. 18.) "[T]he [ICSOP] policy does not attach immediately upon a loss, but only after all available primary insurance has been exhausted." (*Id.* at p. 19.)

*ICSOP* then noted that in *Continental Insurance,* the Supreme Court endorsed an "all sums with stacking" rule for long-tail injuries. *Continental Insurance* reasoned that stacking suited continuous loss injuries. (*Continental Insurance, supra,* 55 Cal.4th at pp. 201–202.) *ICSOP*, however, concluded the rule would not apply to the Truck policies because they prohibited stacking—their language limited recovery to $500,000 "per occurrence." (*ICSOP, supra,* at pp. 32–33.)

*ICSOP* concluded that the Truck policies were exhausted (as to any given claim) after a claim was paid up to the single policy limit, even though a claim was spread across multiple policy periods. (*ICSOP, supra,* p. 35.) Thus, Kaiser could recover from ICSOP to the extent that a claim exceeded the $500,000 per occurrence limit of the 1974 policy. (*Ibid.*) "Accordingly, once Truck has contributed $500,000 per asbestos bodily injury claim, its primary policies are exhausted [with respect to such claim] and Truck has no further contractual obligation to Kaiser." (*Ibid.*) The matter was remanded to the trial court to determine whether Kaiser was entitled to summary adjudication of its fifth

(declaratory relief) and sixth (breach of contract against ICSOP) causes of action of the cross-complaint. (*Id.* at pp. 35–36.)

*ICSOP,* however, was only directed to ICSOP's excess obligations and did not discuss whether Truck could allocate indemnity among its own policies. (*ICSOP, supra* at pp. 5–7.) On March 28, 2014, Truck filed a Third Amended Complaint, the operative complaint for the Phase II trial. Truck alleged it was "entitled to allocate amounts paid in indemnity for each occurrence among all triggered Truck Policies[.]" Truck asserted it could do so based upon the principle that other primary insurers at the same level of coverage could seek contribution from each other.

## B.      Evidence at Phase II Trial and Statement of Decision

For purposes of the Phase II trial, the parties defined the issue as "'whether Truck, after paying indemnity for an [asbestos claim] under its 1974 policy year, can allocate that amount to its other policy years that are triggered by the claim.'"

### 1.      *Evidence At Trial*

The 1971 to 1980 policies contain "anti-stacking" provisions. These anti-stacking provisions prevent the insured from combining the policy limits of all triggered policies, instead limiting the insured to recovery under one policy. All of the policies contain an "all sums" insuring agreement as set forth in the 1974 policy. The agreement provides that Truck agrees "[t]o pay on behalf of the insured all sums which the insured shall become obligated to pay" for personal injury damages suffered by a third party. While an insurance policy will ordinarily pay "all

44

sums" up to its aggregate limit, the 1974 policy had no aggregate limit.

At trial, Kaiser presented evidence showing that under Truck's proposal, Kaiser could potentially lose coverage and defense of claims. For example, approximately $4 million remained in aggregate coverage under the 1980-1983 primary policies; if those policies were exhausted, Kaiser would have to seek coverage under excess policies that did not provide a duty to defend. Thus, Truck's proposal could obligate Kaiser to pay some portion of defense costs that it otherwise would not be required to pay, and could erode the aggregate limits of both the primary and excess policies, eventually leaving Kaiser without coverage for those years.

## 2. *Statement of Decision*

The trial court's statement of decision discerned two bases to deny Truck's allocation proposal. First, because the other three primary insurers' policies had been exhausted, Truck was the only primary insurer still on risk. Thus, Truck's proposal, "if adopted, would allow it to circumvent the 'all sums' requirement under its policy . . . . it would potentially reduce (or even eliminate) coverage for those 'aggregate year' policies for future [asbestos claims]." Second, the trial court found "Truck's proposed equitable allocation would also contravene the *ICSOP* ruling. . . . *ICSOP* makes clear that the only available primary insurance for a continuing injury [asbestos claim] is the 1974 Truck policy." Truck's proposed allocation to its other policy years "would, at the very least, compromise Kaiser's right to 'pick a policy and use it up to the policy limits.' [Citation.]"

Finally, after observing that California was an "all sums" jurisdiction, the trial court concluded Truck's proposal would blur

45

the distinction between "all sums" and "pro-rata" jurisdictions. (See *Viking Pump, Inc. v. Century Indem. Co.* (Del. 2009) 2 A.3d 76 (*Viking Pump*)). The trial court concluded, "There is not a basis under which Truck can equitably contribute benefits under the 1974 policy to its other policy years. There are also no cases cited by Truck permitting an 'all sums' insurer to allocate to its own policies in this manner."

For the reasons discussed below, we agree with the trial court that Truck's proposal is impermissible, and we affirm the Phase II ruling.

## II. DISCUSSION

### A. Truck Cannot Apportion Indemnity Across Multiple Policies

Truck asserts that the "all sums" rule does not bar intra-insurer contribution. Kaiser, on the other hand, argues that any such contribution claim would harm it by reducing or exhausting insurance available under the aggregate-limit policies. Excess insurers LMI, Fireman's Fund and Allianz Underwriters Insurance Company, who are parties to this phase of the litigation, argue that Truck cannot obtain contribution from itself.

#### 1. *Standard of Review*

Truck frames the issue here as one of contribution, an equitable principle reviewed for abuse of discretion. The issue, however, is the legal question of whether, consistent with the insured's *Armstrong* election, the insurer may apportion indemnity payments across other policies it issued for other policy years. If we agree an insurer may do so, *how* such

46

apportionment would be calculated would be an equitable question. Whether the insurer may do so in the first place is a legal question. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 985.)

## 2. *Truck's Proposal is Not Equitable Contribution*

"Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro-rata in proportion to their respective coverage of the risk." (*Fireman's Fund Ins. Co. v. Maryland Casualty Co.* (1998) 65 Cal.App.4th 1279, 1293 (*Fireman's Fund*).) The purpose of the rule "is to accomplish substantial justice by equalizing the common burden shared by coinsurers, and to prevent one insurer from profiting at the expense of others. [Citations.]" (*Id.* at pp. 1293–1294)

Equitable contribution is "predicated on the commonsense principle that where multiple insurers or indemnitors share equal contractual liability for the primary indemnification of a loss or the discharge of an obligation, the selection of which indemnitor is to bear the loss should not be left to the often arbitrary choice of the loss claimant, and no indemnitor should have any incentive to avoid paying a just claim in the hope the claimant will obtain full payment from another coindemnitor. [Citation.]" (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1295.)

The fact that several insurance policies may cover the same risk does not give the insured the right to recover more than once. (*Fireman's Fund, supra* 65 Cal.App.4th at p. 1295.) "Rather, the insured's right of recovery is restricted to the actual amount

47

of the loss. Hence, where there are several policies of insurance on the same risk and the insured has recovered the full amount of its loss from one or more, but not all, of the insurance carriers, the insured has no further rights against the insurers who have not contributed to its recovery." (*Ibid.*)

*Armstrong* addressed contribution rights amongst different insurers on the same risk. The court observed that successive insurers had the obligation to "'respond in full'" to the insured's claim, but that obligation was subject to "'equitable contribution from the issuers of other policies triggered by the same claim.'" (*Armstrong, supra,* 45 Cal.App.4th at p. 51.) In discussing contribution, *Armstrong* considered how such contribution amongst insurers might be calculated, but did not consider intra-insurer contribution. (*Id.* at pp. 51–52.) *Armstrong* therefore does not support Truck's proposition that there can be contribution between policies issued by the same insurer, nor does any other California case.

Based on these authorities, we conclude Truck's proposal is not a theory of equitable contribution. Truck's proposal could expose Kaiser to detrimental exhaustion of Truck's policies having an aggregate limit, resulting in Kaiser losing coverage for what could have been covered claims. Similarly, it could deplete or exhaust layers of excess insurance above the other Truck policies. Truck does not seek contribution from another insurer on the same loss, but rather seeks to shift responsibility for payment of future claims from itself to excess carriers or its insured.

Truck responds that its proposal would not necessarily erode Kaiser's coverage because some of those policy years have no aggregate limit. Truck stresses that the proposal would allow

it to access more reinsurance or excess insurance. (See, e.g., *St. Paul Fire and Marine Ins. Co. v. Ins. Co.* (N.D.Cal. Mar. 7, 2017, Case No. 15-CV-02744-LHK) 2017 U.S. Dist. LEXIS 32551, at p. 31.) Thus, Truck seeks to benefit itself while potentially injuring its insured. The proposal therefore is inconsistent with the notion of fairness underlying equitable contribution.

Truck's resort to the duty of good faith and fair dealing to salvage its proposal similarly fails. Truck argues any apportionment of damages over its policies is governed by its duty of good faith and fair dealing and is subject to judicial review. (See, e.g., *U.S. Fidelity & Guar. Co. v. American Re-Ins. Co.* (2013) 20 N.Y.3d 407, 420 [985 N.E.2d 876] (*U.S. Fidelity*).) In *U.S. Fidelity,* the insurer allocated its losses on no-aggregate limit policies to its own advantage and to the disadvantage of its reinsurer. (*Id.* at p. 486.) There, the court adopted a rule of "objective reasonableness" to determine good faith allocation, but on the facts before it, found no unreasonableness. (*Id.* at pp. 420–421.) Aside from the fact that *U.S. Fidelity* involved reinsurance and has little application here to primary level cross-policy allocation, we see no reason to compel Kaiser to engage in after-the fact litigation to enforce its rights under the policy through the covenant of good faith and fair dealing.

Nonetheless, Truck contends *ICSOP* did not consider the intra-insurer allocation question because it only considered the maximum amount of primary insurance available to pay any one claim, a question controlled by the policy language and anti-stacking provisions. As a matter of equity, however, Truck asserts that issue is distinct from how the amount, once paid, can be allocated among policies. Consequently, Truck contends it is

49

entitled to allocate losses it pays under one triggered policy to all of its triggered policies.

Contrary to Truck's assertion, *ICSOP* does not further its argument and does not permit allocating Kaiser's losses across non-1974 triggered policies. *ICSOP* concluded that based on the policies' anti-stacking provisions, the 1974 policy was the only policy available to pay claims triggering that policy. (*ICSOP, supra,* at p. 30.) This holding alone dooms Truck's argument for cross-policy allocation as it is law of the case. The doctrine "precludes a party from obtaining appellate review of the same issue more than once in a single action." (*Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 62; *Morohoshi v. Pacific Home* (2004) 34 Cal.4th 482, 491.)

### 3. *Truck's Proposal Violates the All Sums Rule of Armstrong*

In contrast to California's rule of "all sums" is the "pro-rata" approach, which "'assigns a dual purpose to the phrase "during the policy period" in the CGL policy's definition of "occurrence." The phrase serves both as a trigger of coverage and as a limitation on the promised "all sums" coverage. . . .' [Citation.]" (*Continental Insurance, supra,* 55 Cal.4th at p. 198.) As explained in *Continental Insurance,* "'This approach emphasizes that part of a long-tail injury will occur outside any particular policy period. Rather than requiring any one policy to cover the entire long-tail loss, [pro-rata] allocation instead attempts to produce equity across time.' [Citation.]" (*Ibid.*) As the name implies, "[u]nder the most basic scheme of pro-rata allocation, an equal share of the amount of damage is assigned to each year over which a long-tail injury occurred. The amount owed under any one policy is calculated by dividing the number of

years an insurer was 'on the risk' by the total number of years that the progressive damage took place. The resulting fraction is the portion of the liability owed by the particular insurer." (*Id.* at p. 199.) Although some states have concluded that pro-rata coverage is more equitable, in California the language of CGL policies requires that the "all sums" approach is used. (*Ibid.*)

As explained in *Viking Pump*, *supra*, 2 A.3d 76, "[t]he all sums approach resembles joint and several liability in the sense that the insured may collect against any insurer whose policy is triggered, up to the policy's relevant per occurrence total limits, in the same way that a plaintiff, if exposed to asbestos by two different defendants in the same case, might collect his entire judgment from one of the defendants and leave the paying defendant to seek contribution from the other defendant in a later action. . . . " (*Id.* at p. 111, fn. omitted.) Under the pro-rata approach, "a court must somewhat arbitrarily divvy up the total liability of the insured among its insurers, treating them as if they were divisible injuries." (*Id.* at p. 112.) If a court "applied the so-called 'time on the risk' method for prorating liability, the court would divide up liability according to what percentage of the injury the insurance policy covered." (*Ibid.*, fn. omitted.)

"For obvious reasons, the all sums approach tends to be favored by insured[s] and the pro-rata approach by insurers. The all sums approach lets the insured pick a policy and use it up to the policy limits, and leave questions of apportionment to be fought out later among the insurers themselves. The pro-rata approach gives insurers material reductions in their exposure by shifting from the insurer to the insured the risk of periods of exposure when the insured lacked coverage or the insurer for that period went bankrupt, or during which another defendant

51

was responsible for exposure to the insured, even if the insured itself was held jointly and severally responsible for the plaintiff's entire harm." (*Viking Pump, supra,* 2 A.3d at pp. 112–113.)

Here, Truck seeks to import the concept of contribution among insurers into the "all sums" structure of its own 19 policies, analogizing its policies to those issued by multiple insurers. We find to do so would contravene the "all sums" language of the policies requiring Truck to pay all sums due to Kaiser, and is inconsistent with *Armstrong* because it could reduce the amount of insurance available to Kaiser and the asbestos claimants by exhausting policies with aggregate limits.

Truck's proposal runs contrary to its contractual obligation to Kaiser to pay "all sums" for which Kaiser is liable. For example, asbestos claims with dates of first exposure after 1980 would trigger only Truck policies with aggregate limits. But those policies might be exhausted by Truck's allocation proposal. As explained in *Armstrong,* "apportionment among multiple insurers must be distinguished from apportionment between an insurer and its insured. When multiple policies are triggered on a single claim, the insurer's liability is apportioned pursuant to the 'other insurance' clauses of the policies [citations] or under the equitable doctrine of contribution. [Citations.] That apportionment [among insurers], however, has no bearing upon the insurer's obligation to the policyholder [Citation.] . . . . [Citation.] The insurers' contractual obligation to the policyholder is to cover the full extent of the policyholder's liability (up to the policy limits)." (*Armstrong, supra,* 45 Cal.App.4th at pp. 105–106.) In other words, the insurer must pay "all sums" under the policy, rendering equitable contribution a matter between insurers, unrelated to the insurer's contractual indemnity

obligation to its insured. (*Aerojet, supra,* 17 Cal.4th at p. 72 [equitable contribution "has no place between insurer and insured"]; *Dart Industries Inc. v. Commercial Union Ins. Co.* (2002) 28 Cal.4th 1059, 1080.)

Truck's proposal would be detrimental to Kaiser because it could exhaust policies available to Kaiser for claims that do not trigger the 1974 policy. Truck could exhaust those non-1974 policies that have aggregate limits with its proposal, leaving Kaiser with no indemnification for future claims that trigger those policies but not the 1974 policy. As explained in *Flintkote Co. v. General Accident Assur. Co.* (N.D.Cal. Aug. 6, 2008, No. C 04-01827 MHP) 2008 U.S. Dist. LEXIS 108245 (*Flintkote*), upon which Truck relies, "where an insurer with unlimited aggregate liability breaches, and the gap is filled by an insurer whose performance [erodes] a liability policy with an aggregate limit, the insured suffers damage directly when the policy with an aggregate limit is unavailable to respond to later claims. In other words, [the insured] is directly harmed insofar as it can no longer rely on the policy with an aggregate limit to cover future claims and is forced to pay the claim on its own." (*Id.* at pp. 10– 11.)[11]

_____

11    Generally, an unpublished California opinion may not be cited or relied upon. (Cal. Rules of Court, rule 8.1115.) However, citation to unpublished opinions from other jurisdictions for their persuasive value does not violate this rule. (See *Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1096, fn. 18, emphasis omitted ["Citing unpublished federal opinions does not violate our rules [Citation.]"].) Opinions from other jurisdictions—some of which have different publication criteria than California—can be cited without regard to their publication status and may be

Truck posits that the only difference between all-sums and pro-rata jurisdictions is when the allocation is made—after a claim is handled, even under an all-sums approach the loss may be equitably distributed between all triggered policies because even *Armstrong* recognized the "'method of allocation only affects the timing of payments.'" (*Armstrong, supra,* 45 Cal.App.4th at p. 53, fn. 17.) We disagree. Truck's cited portion of *Armstrong's* allocation discussion did not discuss intra-insurer allocation, but instead related to equitable contribution among insurers on the same risk. (*Id.* at p. 53.) On that basis, it is of no help to Truck.

Thus, we reject Truck's attempt to escape the confines of the *Armstrong* rule by arguing it can obtain contribution from itself via allocation of losses under the 1974 policy to other policy years. *Armstrong* observed that although the all-sums approach prevents an insurer from apportioning a share of the loss to the insured, the insurers can apportion a loss among themselves as long as at least one of them makes good on all sums owed to the insured. (*Armstrong, supra,* 45 Cal.App.4th at p. 51.) This rule does not mean Truck can obtain contribution from itself—Truck's self-contribution theory does not equate to contribution among different insurers. (*Ibid.*; see also, *Flintkote, supra,* 2008 U.S.Dist. LEXIS 108245 pp. 17–21.)

---

regarded as persuasive. (*Central Laborers' Pension Fund v. McAfee, Inc.* (2017) 17 Cal.App.5th 292, 319, fn. 9.) In that regard, unpublished federal opinions are citable as persuasive, although not precedential, authority. (*Pacific Shore Funding v. Lozo* (2006) 138 Cal.App.4th 1342, 1352, fn. 6.)

## PHASE III-A: (1) DUTY OF EXCESS CARRIERS TO DROP DOWN AND (2) AMOUNT OF TRUCK'S PER OCCURRENCE INDEMNITY OBLIGATION UNDER THE 1974 POLICY

The Phase III-A trial addressed two issues. The first issue was "[w]hether the first layer excess/umbrella policies of [LMI, First State, and Westchester Fire Insurance] ha[d] a duty to 'drop down' and contribute a pro-rata share for their policy years to Truck."[12] The trial court said no. We agree. The second issue was whether Truck has a "contractual obligation to pay a [per occurrence] limit of liability up to $500,000 or $495,000 under the terms of its 1974 primary policy." The trial judge ruled that Truck was obligated to pay up to $495,000 in indemnity payments, with Kaiser contributing $5,000 as a deductible. We agree with that ruling as well.

### Phase III-A, Part 1

## I.     EVIDENCE AT PHASE III-A, PART 1 TRIAL

Truck argued that because the other three primary insurers' policies had been exhausted, pursuant to the "other insurance" clause in its own policies, as well as the excess policies' language requiring them to "drop down," the excess

---

12     Previously, in *ICSOP*, the court held that ICSOP's excess policy attached when a claim exhausted the $500,000 per claim limit. (*ICSOP, supra,* at p. 56.) Thus, the ICSOP policy was not at issue in Phase III-A, part 1. (See, e.g., Trial Court's Statement of Decision, Phase III-A, p. 38, fn. 21.)

insurers[13] were required to defend and indemnify Kaiser "immediately upon the exhaustion of the aggregate limits of liability of the primary policy directly beneath" them.

## A.    Excess Policy Provisions

The excess policies[14] contained the following relevant provisions:

LMI: The LMI policies were in effect from 1947 to 1964, and stated that they would attach upon exhaustion of "*other*

---

[13]    Excess insurers LMI, Westchester and First State filed separate respondents' briefs in Truck's Phase III-A appeal. Joining in LMI's respondent's brief are excess insurers ICSOP, Granite State Insurance Company, Continental Insurance Company, Fireman's Fund Insurance Company, Allianz Underwriters Insurance Company, National Casualty Company, Sentry Insurance, Evanston Insurance Company, Transport Insurance Company, and TIG Insurance Company. Joining in First State's respondent's brief are excess insurers Evanston Insurance Company and TIG Insurance Company. Joining in Westchester's respondent's brief are excess insurers Transport Insurance Company, Granite State Insurance Company, Evanston Insurance Company and TIG Insurance Company.

[14]    Excess insurance policies have several forms. An excess policy may be written as (1) excess to a particular policy or policies; (2) excess to coverage provided by a particular primary insurer; (3) excess to any insurance coverage available to the insured; or (4) excess to the applicable limits of scheduled policies. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2021) ¶ 8:181 (Rutter Guide).) Where the excess is excess to identified policies, it is called "specific excess." (*Olympic Insurance. v. Employers Surplus Lines Ins. Co.* (1981) 126 Cal.App.3d 593, 598 (*Olympic Insurance*).)

*insurances . . .* whether recoverable or not . . ." The 1958 to 1961 policies provided if *other valid and collectible insurance* with another insurer was available to the insured covering a loss also covered by LMI, other than LMI's excess insurance, "the insurance afforded by this certificate shall be in excess of and shall not contribute with such other insurance." The 1961 to 1964 policies stated that the policies were excess of the limits of the underling insurance, and specified that "[i]f *other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy*, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with other insurance."

Westchester: The Westchester policy was in effect from May 1, 1984 to April 1, 1985. The policy provided that "the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of: [¶] the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of *any other insurance collectible by the insured . . .*" (Emphasis added.) The policy also provided that in the event of reduction or exhaustion of the underlying policies listed on Schedule A, the Westchester policy "shall continue in force as underlying insurance."

First State: First State's excess policy was issued for the 1983 to 1984 policy year. First State promised to indemnify "an amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule A of underlying insurance, plus the applicable limits of *any other underlying insurance collectible by the insured*[.]" (Emphasis added.)

57

## B.    Statement of Decision

The trial court found the excess insurers had no duty to "drop down" and equitably contribute to Truck under the 1974 policy, rejecting Truck's argument there had been "vertical exhaustion" of the other primary insurers' policies. Instead, the trial court found that the default California rule of "horizontal exhaustion" controlled, as set forth in *Community Redevelopment Agency v. Aetna Casualty & Surety Co.* (1996) 50 Cal.App.4th 329 (*Community Redevelopment*). Under that rule, all primary insurance must exhaust before any excess policy must indemnify the insured. (*Id.* at p. 339.) Horizontal exhaustion is contrasted with "vertical exhaustion," where "coverage attaches under an excess policy when the limits of a specifically scheduled underlying policy are exhausted and the language of the excess policy provides that it shall be excess only to that specific underlying policy." (*Id.* at pp. 339–340, fn. omitted.)

The trial court concluded that *Community Redevelopment* and *ICSOP* controlled, having addressed identical excess policy language, and as a result the excess carriers had no duty to drop down until there was horizontal exhaustion, namely, all primary policies on the risk exhausted. The court explained that *Community Redevelopment* made it clear that in spite of a reference to scheduled underlying insurance, where the excess policy contained the phrase "other insurance," the rule of horizontal exhaustion applied, and that Truck's interpretation would convert excess insurers into primary insurers.

## II.    DISCUSSION

Truck argues that the 1974 no-aggregate limit primary policy can trigger the excess insurers to drop down on a per

58

occurrence basis, rather than when all primary insurance has been exhausted, thereby converting the excess policies into policies that vertically exhaust by virtue of being "specific excess."

Truck reaches this result by selectively focusing on the "continue in force as underlying insurance" language providing the excess policies attach upon exhaustion of specifically scheduled underlying primary policies, thereby transforming the policies into "specific excess" policies that need not horizontally exhaust. Truck asserts it therefore falls within the exception to the horizontal exhaustion rule set forth in *Community Redevelopment* for policies "describing and limiting the underlying insurance" as the policy language in both instances is basically equivalent. (See *Community Redevelopment, supra,* 50 Cal.App.4th at p. 340, emphasis omitted.) In addition, Truck argues that the recent decision of *Montrose III, supra,* 9 Cal.5th 215 supports its position because *Montrose III* has essentially eliminated horizontal exhaustion where, as here, a specific underlying primary insurance has exhausted. We disagree, finding *Community Redevelopment* controls and as a result, *all* primary policies must exhaust.

### A. Standard of Review

"Normal rules of policy interpretation [ ] apply in determining coverage under excess policies." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2020) ¶ 8:180.) "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citations.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868.) While the primary policy may be consulted in interpreting an excess

59

policy, each policy is a separate document and is interpreted separately. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 8:180.5; *Northrop Grumman Corp. v. Factory Mut. Ins. Co.* (9th Cir. 2009) 563 F.3d 777, 785 [primary policy must be consulted in interpreting the excess policy, but court does not treat the two documents as one contract].) Where, as here, there are no factual disputes and hence the interpretation of the contracts does not depend upon extrinsic evidence, their interpretation is a matter of law. (*Oh v. Teachers Ins. and Annuity Assn. of America* (2020) 53 Cal.App.5th 71, 84.)

## B.     Excess and Primary Insurance

Primary insurance, or the first layer of insurance, provides immediate coverage upon the occurrence of a loss. (*St. Paul Mercury Ins. Co. v. Frontier Pacific Ins. Co.* (2003) 111 Cal.App.4th 1234, 1252-1253.) Excess insurance, or the second (or higher) layer of insurance, provides coverage once primary insurance is exhausted. (*Montrose III, supra,* 9 Cal.5th at p. 222.) "An excess insurer's obligation begins once a certain level of loss or liability is reached; that level is generally referred to as the "'attachment point'" of the excess policy. [Citation.]" (*Id.* at p. 223.) As long as primary coverage exists, an excess insurer has no duty to contribute to defense or indemnity. (*Olympic Insurance, supra,* 126 Cal.App.3d at p. 601.) No contractual obligations exist between primary and excess insurers; rather any rights and duties flow from equitable principles. (*Signal Cos. v. Harbor Ins. Co.* (1980) 27 Cal.3d 359, 369.)

60

## C.  *Community Redevelopment* and Horizontal Exhaustion

*Community Redevelopment* applied the default "horizontal exhaustion" rule in holding that an excess insurer had no duty to drop down and provide a defense to an insured before the liability limits of all primary policies had been exhausted. (*Community Redevelopment, supra,* 50 Cal.App.4th at p. 341.) There, the "unambiguous" excess policy language conditioned coverage on the exhaustion of "'any . . . valid and collectible'" underlying insurance, which language *Community Redevelopment* held must be read to include all available primary insurance. (*Id.* at pp. 338–339.) *Community Redevelopment* reasoned that applying the horizontal exhaustion rule to continuous loss cases remained consistent with *Montrose I,* which holds that long-tail losses are covered by all policies in effect during the periods of injury. (*Montrose I, supra*, 10 Cal.4th at p. 673.) "Absent a provision in the excess policy *specifically describing and limiting* the underlying insurance, a horizontal exhaustion rule should be applied in continuous loss cases . . . [A]ll of the primary policies in force during the period of continuous loss will be deemed primary policies to each of the excess policies covering that same period. . . .  [Thus,] *all* of the primary policies must exhaust[.]" (*Community Redevelopment, supra,* 50 Cal.App.4th at p. 340; see also *Stonewall Ins. Co. v. City of Palos Verdes Estates* (1996) 46 Cal.App.4th 1810, 1853 (*Stonewall*) [horizontal exhaustion approach more consistent with *Montrose's* continuous trigger approach].) As *Stonewall* further explained, "if 'occurrences' are continuously occurring throughout a period of time, all of the primary policies in force during that period of time cover these occurrences, and all of them are primary to each of the excess

61

policies; and if the limits of liability of each of these primary policies is adequate in the aggregate to cover the liability of the insured, there is no 'excess' loss for the excess policies to cover." (*Stonewall, supra,* 46 Cal.App.4th at p. 1853.)

## D. *Montrose III* and Vertical Exhaustion

*Community Redevelopment* considered an underlying layer of primary insurance. In contrast, *Montrose III* considered multiple layers of excess insurance. (*Montrose III*, *supra*, 9 Cal.5th at p. 226.) *Montrose III* held that based on policy language equivalent to that analyzed in *Community Redevelopment,* a vertical exhaustion rule applied. (*Id.* at pp. 226, 237.) Addressing the order in which an insured may access excess policies from different policy periods to cover liability arising from long-tail injuries, the insurers argued that the "other insurance" clauses in the excess policies providing "that each policy shall be excess to other insurance available to the insured, whether or not the other insurance is specifically listed in the policy's schedule of underlying insurance" mandated horizontal exhaustion. (*Id.* at p. 230.) Thus, they reasoned, in the case of a long-tail injury, "every policy with a lower attachment point from every policy period triggered by the continuous injury" must exhaust before a higher-level excess policy must contribute. (*Ibid.*)

Rejecting the insurers' arguments, *Montrose III* applied a rule of vertical exhaustion and concluded "that in a case involving continuous injury, where all primary insurance has been exhausted, the policy language at issue" permitted "the insured to access any excess policy for indemnification during a triggered policy period once the directly underlying excess insurance has

been exhausted." (*Montrose III, supra,* 9 Cal.5th at p. 237.) *Montrose III* relied on both the policy language regarding "other insurance" as well as the practicalities and equities of multiple layers of excess insurance and long-tail injuries. (*Ibid.*)

Examining the policy language, *Montrose III* first observed that the "other insurance clauses" did not "speak clearly to the question before" it. (*Montrose III, supra,* 9 Cal.5th at p. 233.) Instead, "other aspects of the insurance policies strongly suggest that the exhaustion requirements were meant to apply to directly underlying insurance and not to insurance purchased for other policy periods." (*Ibid.*) *Montrose III* found that "other insurance" clauses were traditionally used to prevent multiple recoveries when more than one policy provided coverage for a particular loss, and they "have not generally been understood as dictating a particular exhaustion rule for policy holders seeking to access successive [layers of] excess insurance policies in cases of long-tail injury." (*Id.* at p. 231.) Rather, such clauses "have generally been used to address '[a]llocation questions with respect to overlapping *concurrent policies.'* [Citation.]" (*Id.* at p. 232, emphasis in original.)

*Montrose III* relied on the policies' express statement of their attachment point, "generally by referencing a specific dollar amount of underlying insurance in the same policy period that must be exhausted." (*Montrose III, supra,* 9 Cal.5th at p. 233.) Further, the excess policies included or referenced schedules of underlying insurance, all covering the same policy period. (*Id.* at p. 234.) *Montrose III* rejected the insurers' interpretation and concluded that "[r]ather, in the absence of any more persuasive indication that the parties intended otherwise, the policies are most naturally read to mean that [the insured] may access its

excess insurance whenever it has exhausted the other directly underlying excess insurance policies that were purchased for the same policy period." (*Ibid.*)

Applying an additional rationale, *Montrose III* found myriad "practical obstacles to securing indemnification" that precluded horizontal exhaustion, namely, the lack of standardization of policy language that would require examination of myriad different periods of time, differing levels of coverage, and distinct exclusions, terms, and conditions. (*Montrose III, supra,* 9 Cal.5th at p. 235.) "In sum, '[h]orizontal exhaustion would create as many layers of additional litigation as there are layers of policies.' [Citation.]" (*Ibid.*) "A rule of vertical exhaustion does not restrict the insured from accessing excess coverage from other [excess] policy periods if the terms and conditions are otherwise met; it merely relieves the insured of the obligation of establishing whether *all* of the applicable terms and conditions at any given 'layer' of excess coverage are met before it accesses the next 'layer' of coverage." (*Id. a*t pp. 235–236.)

Finally, *Montrose III* distinguished *Community Redevelopment, supra,* 50 Cal.App.4th 329. (*Montrose III, supra,* 9 Cal.5th. at p. 237.) *Montrose III* noted that the procedural posture of the case before it was different than *Community Redevelopment: Montrose III* involved a dispute between an insured and its excess insurers, while *Community Development,* like the case before us, involved a dispute between a primary insurer and an excess insurer. (*Montrose III, supra,* 9 Cal.5th. at p. 237.)

In spite of *Montrose III*'s directive with respect to primary insurance, a recent case applied *Montrose III* to primary insurance. In *SantaFe Braun, Inc. v. Insurance Co. of North*

*America* (2020) 52 Cal.App.5th 19 (*SantaFe Braun*), the appellate court extended *Montrose III* and concluded that primary insurance need not be horizontally exhausted across all policy years before excess coverage in a particular policy year is triggered. (*Id.* at p. 29.) *SantaFe Braun* reasoned that the first-level excess policies contained language comparable to that in *Montrose III,* suggesting that the exhaustion requirements applied to directly underlying insurance and not to insurance purchased for other policy periods. (*Id.* at p. 28.) Thus, any differences between primary and excess insurance "provide[d] little justification for construing the policy language interpreted in *Montrose III* differently simply because primary coverage purchased often many years later for other policy periods remain[ed] outstanding." (*Ibid.*)

     *SantaFe Braun* found the difference in premiums paid similarly provided no justification for distinguishing between multiple levels of excess insurance on the one hand and primary and excess insurance on the other. (*SantaFe Braun, supra,* 52 Cal.App.5th at pp. 28–29.) "If horizontal exhaustion of all primary insurance were required to trigger the coverage, the level of liability at which the excess coverage would attach would be unascertainable. . . . The difference between premiums paid for excess and for primary policies does not justify an interpretation that renders the point of attachment so unpredictable and unascertainable when the policy is issued." (*Ibid.*) Finally, the differing defense obligations of primary and excess insurers did not compel horizontal exhaustion because the rule that an excess insurer has no duty to defend absent policy language to the contrary would apply whether horizontal or vertical exhaustion was applied. (*Id.* at p. 29.) In conclusion,

*SantaFe Braun* found *Community Redevelopment'*s horizontal exhaustion rule did not apply because it relied on an interpretation of the policy language rejected by *Montrose III.* (*Id.* at p. 30.)

### E. All Primary Insurance Must Exhaust

We disagree with *SantaFe Braun* that there is no distinction between multiple layers of excess insurance, as in *Montrose III,* and layers of primary and excess insurance. One of the rationales of *Montrose III*—that it was too difficult to determine attachment points when multiple layers of excess insurance were implicated—does not apply here, where there is only one underlying layer of insurance, namely, primary insurance and it is easy to ascertain whether that insurance has been exhausted.

Second, primary and excess insurance are qualitatively different. Primary policies attach as first-dollar coverage and have an immediate obligation to respond; primary policies have the right to control the defense without input from excess insurers; and primary policies generally do not use defense costs to reduce limits. (See, e.g., *Columbia Casualty. Co. v. Northwest Nat. Ins. Co.* (1991) 231 Cal.App.3d 457, 470–472.) Significantly, the premiums charged for primary insurance differ from excess insurance because the latter insurance may never be called upon to indemnify the insured, whereas primary insurance is always implicated if a claim is filed. (See, e.g., *Padilla Construction Co., Inc. v. Transportation Ins. Co.* (2007) 150 Cal.App.4th 984, 1003.)

We therefore apply *Community Redevelopment* to the language in the excess insurers' policies, and find horizontal exhaustion applies. Such policies all have language tracking the horizontal exhaustion language examined in *Community*

66

*Redevelopment* and in *ICSOP.* Both the Westchester and First State policies expressly refer to "other insurance" or "other underlying insurance" that must exhaust. The policies in LMI have different language that expresses the same concept: "after making deductions for all recoveries, salvages, and *other insurances*[,]" "if *other valid and collectible insurance* with another insurer was available to the insured covering a loss also covered by LMI, other than LMI's excess insurance, the insurance afforded by this certificate shall be in excess of and shall not contribute with such other insurance[,]" and that "[i]f *other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy*, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with other insurance."

In spite of the clear directive of the horizontal exhaustion rule, Truck argues the 1974 no-aggregate limit primary policy can still trigger excess drop-down on a per occurrence basis, converting the excess policies into policies that vertically exhaust by virtue of being "specific excess." Truck does so by selectively focusing on the "continue in force as underlying insurance" language that applies upon exhaustion of specifically scheduled underlying primary policies. Truck takes this language out of context and reads it in isolation from the rest of the policy, however. The "continue in force" language is modified not only by the specified underlying policies, but also by the "other insurance" that also must be exhausted. Indeed, the key language is the "other insurance" language of the policies, which requires horizontal exhaustion.

67

## F.    No Contribution From Excess Insurers

To the extent Truck separately argues for contribution from the excess insurers, we are unpersuaded.

Insurers can obtain contribution from other insurers on the same risk and sharing the same level of liability (*North American Capacity Ins. Co. v. Claremont Liability Ins. Co.* (2009) 177 Cal.App.4th 272, 295.) Absent a specific agreement to the contrary, there is no contribution between primary and excess insurers. (*Reliance Nat. Indemnity Co. v. General Star Indemnity Co.* (1999) 72 Cal.App.4th 1063, 1080.)

Here, Truck's argument necessarily assumes its own erroneous conclusion: that the excess policies have already dropped down and thus contribution is appropriate between insurers because they are now on the same level. The reality is that Truck, as a primary insurer, cannot obtain contribution from an insurer on a different level.

## Phase III-A, Part 2

Truck and the excess insurers disputed the meaning and effect of the deductible provision in the 1974 policy. The trial court agreed with Truck that the deductible reduced the total $500,000 limit available under the 1974 policy such that $495,000 was recoverable. The excess insurers argued that the $5,000 deductible reduces covered damages, and did not reduce Truck's $500,000 per occurrence limit because the policy language does not contain the "difference between" language that is the hallmark of deductibles that reduce limits. LMI and ICSOP cross-appeal the trial court's ruling on the deductible issue.

## A. Factual Background

The 1974 policy has a per occurrence limit of $500,000. The policy states that "$5,000 shall be deducted from the total amount to be paid for all damages which the Insured becomes legally obligated to pay on account of each occurrence."

At trial, Truck asserted this language meant its policy limit was effectively reduced to $495,000 for each occurrence. Meanwhile the excess insurers asserted that the deductible would first be applied to the claim, followed by Truck's full $500,000 limit, before the claim could be submitted to the excess insurers. The excess insurers introduced extrinsic evidence regarding the parties' course of performance, citing two examples to establish that Truck acknowledged its obligations to pay the full $500,000: In the first, the "Kiln Brick incident" of 1983, Truck treated Kaiser's deductible as coming out of the "total amount to be paid for all damages[.]" The second example arose from the current litigation, where Kaiser acknowledged that the $5,000 per occurrence deductible was to be deducted not from the policy limit but from the total amount of each asbestos settlement.

The trial court framed the issue as "[w]hether Truck has a contractual obligation to pay a limit of liability up to $500,000 or $495,000 under the terms of its 1974 primary policy[.]" Relying on an analysis of comparable policy language in the Rutter Guide at ¶¶ 7:380 et seq., the court considered whether the deductible language had the effect of making the insured responsible for the first $5,000 of damages, or whether it had the effect of reducing policy coverage. The trial court concluded the policy language stating "the 'total amount to be paid for all damages which [the Insured] becomes legally obligated to pay on account of each

occurrence' "meant the deductible of the 1974 policy was of the type that reduced coverage. The trial court observed that "[t]o adopt the Excess Carriers' interpretation would, for all intents and purposes, eliminate the deductible provision, because Truck's limit of liability would be increased to $505,000 (and not the $500,000 set forth in the Truck policy)."

## B. The $5,000 Deductible of the 1974 Policy Reduces Policy Limits

### 1. *Standard of Review and Principles of Contract Interpretation*

"The interpretation of a contract is a judicial function. [Citation.] . . . . Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. [Citations.]" (*Wolf v. Walt Disney Pictures and Television* (2008) 162 Cal.App.4th 1107, 1125–1126.) While the court generally may not consider extrinsic evidence to interpret a contract, such evidence is admissible to interpret an agreement when a material term is ambiguous. (*Id.* at p. 1126) The terms of a writing can "be explained or supplemented by course of dealing or usage of trade or by course of performance." (Code Civ. Proc., § 1856, subd. (c).) "Indeed, where there is a fixed and established usage and custom of trade, the parties are presumed to contract pursuant thereto. [Citations.] Thus, courts can rely on usage and custom to imply a term where the contract itself is silent in that regard." (*Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1240–1241.) "An appellate court is *not* bound by a trial court's construction of a contract where . . . there is *no conflict* in the properly admitted extrinsic evidence . . . . [H]owever, where the interpretation of the

contract turns upon the credibility of conflicting extrinsic evidence which was properly admitted at trial, an appellate court will uphold any reasonable construction of the contract by the trial court. [Citation.]" (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 913.) Here, the parties admitted evidence of their custom and practice with respect to the deductible, but the trial court ruled on the issue by solely addressing the policy language, thereby implicitly finding the language to be unambiguous. We make the same finding.

### 2. The Deductible Language Has the Effect of Reducing Policy Limits

"'Liability insurance policies often contain a "deductible" or a "self-insured retention" (SIR) requiring the insured to bear a portion of a loss otherwise covered by the policy.' [Citation.]" (*Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466, 1473-1474; see also *Deere & Co. v. Allstate Ins. Co.* (2019) 32 Cal.App.5th 499, 505 [discussing different effect of SIRs and deductibles on policy limits in context of whether primary policy SIRs are incorporated into excess policies].) The amount of the deductible is ordinarily set forth on the declarations page or in an endorsement to the policy. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:379.)

In explaining the types of deductibles, the Rutter Guide gives two examples. The first is where the deductible is "per occurrence," under which the insured is responsible for the first deductible portion of damages, but the policy limits remain the same. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7.380, 7.380.1.) Such language is often styled, "[t]he $10,000 Deductible stated in the Declarations shall be applicable

to each occurrence. [Citation.]" (*Id.* at ¶ 7.380.1.) In practical effect, "[t]he insured is responsible for the first $10,000 of damages, but the policy limits are not affected. . . . [T]he insurer is responsible for all damages exceeding $10,000 up to the full policy limits, as well as for defense costs." (*Id.* at ¶ 7:380.2.)

A second example involves a deductible that can effectively reduce coverage. Such a deductible may be described as "The $10,000 Deductible stated in the Declarations shall be applicable to each occurrence and the Company shall be liable only *for the difference* between such deductible amount and the amount of insurance otherwise applicable to each claim." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7380.5, emphasis added.) This language would result in the first $10,000 of damages being paid by the insured. (*Id* at. ¶ 7380.6.) "The amount paid by [the insured] reduces the amount of coverage otherwise available; i.e., the policy limits are reduced by $10,000." (*Ibid.*)

Here, the trial court did not err. We need not consider the extrinsic evidence of custom and practice because the language of the policy is not ambiguous. Although the language does not precisely track the Rutter Guide examples, those examples are instructive. The deductible language here is more like the second Rutter Guide example because it relates to the difference between the deductible and the policy limits. It therefore has the effect of reducing coverage because it states "$5,000 *shall be deducted from the total amount to be paid for all damages* which the Insured becomes legally obligated to pay on account of *each occurrence.*" (Emphasis added.) This unambiguous language has the net effect of reducing the policy limits by the amount of the deductible.

## DISPOSITION

The portion of the final judgment relating to Phase I is reversed. Deductibles on claims where any indemnity payment was made more than four years before the filing of Truck's second amended complaint on August 23, 2007 are time-barred and may not be reopened. The matter is remanded to the trial court for further proceedings consistent with our Phase I holding.

The judgment with respect to Phase II is affirmed. The judgment with respect to Phase III-A, Part One and Phase III-A, Part Two, is also affirmed.

Kaiser shall recover its costs on appeal from Truck. All other parties shall bear their own costs.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, J.


We concur:


WILLHITE, Acting P.J.


COLLINS, J.

73